Joyce DIXON, Individually and as Administratrix of the Estate of Wesley Dixon, deceased, Plaintiff–Appellant,

v.

The CITY OF LAWTON, OKLAHOMA; Officer Dan Borders; Officer Sam Helton and Lieutenant Bill Adamson, Defendants–Appellees.

No. 86–2447.

United States Court of Appeals, Tenth Circuit.

March 8, 1990

Michael A. Williams (Dario Aguirre with him on the brief), Sherman & Howard, Denver, Colo., for plaintiff-appellant.

Richard L. Denney (Lydia JoAnn Barrett with him on the brief), Denney Law Firm, Norman, Okl., for defendants-appellees.

Before TACHA, GARTH * and BALDOCK, Circuit Judges.

BALDOCK, Circuit Judge.

Plaintiff-appellant administratrix brought this civil rights action pursuant to 42 U.S.C. §§ 1983 and 1985(3) against defendants-appellees City of Lawton and three police officers seeking redress for the shooting death of her son, Wesley Raynard Dixon (Dixon). After a six-day trial, the jury on specific interrogatories found in favor of each individual defendant and the city on the § 1983 claim, and in favor of the individual defendants on the § 1985(3) claim. The district court entered judgment on the jury verdict in favor of all defendants. Plaintiff now appeals arguing that 1) the district court's jury instruction concerning § 1985(3) was erroneous because it instructed that § 1983 liability was a condition precedent to liability under § 1985(3), and 2) the district court's admission of psychotherapist-patient communications was erroneous because of evolving federal common law privilege. While we do not agree with the second point, we agree with the first point. Nevertheless, we affirm the judgment because our review of the record convinces us that plaintiff's theory of the case was encompassed completely under § 1983. Accordingly, the error was harmless.

This tragic Sunday morning incident began after plaintiff's decedent Wesley Dixon spotted a neighbor and friend, Rhonda Perry, in a parked car with her boyfriend, Rodney Harris (Harris). According to one account, Dixon slapped Rhonda Perry while she was seated in the car because Dixon suspected her of cheating on his best friend, Bobby Dale. The conflict escalated. Harris jumped out the car and a fistfight broke out between Harris and Dixon. A neighborhood crowd gathered and several people separated Harris and Dixon for a short time. The fight resumed with Harris as the aggressor, however, and the two were separated again.

After the fight was broken up the second time, a close friend and neighbor of the Dixon family, Dorothy Jackson, asked Dixon what was wrong. He indicated that he was all right. She then asked him about his belt buckle, which displayed the name "Dick." Without responding verbally to her question, Dixon undressed while outside. Dorothy Jackson's son-in-law, Virgil

Maddox, then got a blanket, covered the naked Dixon and tried to calm and restrain him. Dixon was moved to the Maddox porch (across the street from the Dixon home) where Dixon twice asked his nephew, Stacey Sutton, to bring him a gun. Sutton refused. Dixon then was taken home by Maddox and Broderick Jackson, son of Dorothy Jackson.

Once home, Dixon talked with Maddox and Broderick Jackson. The two no longer restrained him. Broderick Jackson testified:

> You know he's (Dixon) talking about God, said God is tired of all these people, you know, sleeping with ... other men's wives, and things like that, God is tired of all the sin. He said ... God sent him on a mission—God sent him on a mission of some sort.

Rec. vol. III at 469. Dixon then became agitated, went to the back of his home and returned with a gun. Maddox wrestled the gun away from Dixon and gave it to Stacey Sutton, who put it in a coat closet.

By this time, the Lawton police department had been called by neighbors. On the report that there was a naked man with a gun, defendant-appellee Officer Borders (Borders) was dispatched to the scene and arrived first. Defendants-appellees Lieutenant Adamson (Adamson) and Officer Helton arrived thereafter. An unidentified neighbor ran out of the Dixon home yelling: "He's got a gun." On this information, an understanding was reached between Officer Borders and Broderick Jackson, who had come outside, whereby Jackson would attempt to persuade Dixon to come out of his home without the gun. While the officers waited outside, Broderick Jackson went inside the Dixon home. Jackson testified that Dixon initially indicated that he would comply with the police request, but that he needed some clothes from his coat closet. Dixon proceeded to the closet and dived for his gun. Rec. vol. III at 472. Maddox then attempted to take the gun away from Dixon a second time.

By this time, the officers were at the front door of the home. Betty Sutton Womack, Dixon's sister, declined to let the officers inside. Adamson and Borders heard a physical struggle in progress and pushed Betty Sutton Womack aside. They saw Maddox attempting to restrain Dixon, who had an Armalite AR–18 semi-automatic gas operated rifle [1] with an ammunition clip in it. The ejector port was open, which indicated that the bolt of the rifle had been cocked. Adamson grabbed the barrel end of the rifle and Borders the stock end. Although Dixon was in a crouched position with Maddox attempting to restrain him, Dixon would not let go of the rifle after being told to do so by Adamson. Unable to obtain control of the rifle and having lost his night stick in the struggle, Borders struck Dixon twice on the side of his head with his .357 magnum service revolver while Lieutenant Adamson tried to control the barrel end of Dixon's rifle. At this point, Maddox left. According to the officers, Dixon fired two shots which hit the floor. Borders testified that he thought Adamson had been shot and that he would be next. With his left hand, Borders pushed Dixon to the right and fired five times. In the process, Borders shot himself in the left thumb. Again, according to the officers, Dixon continued to fire the rifle.

Dixon probably lost consciousness within minutes and may have lived thirty minutes before expiring. Dixon's autopsy revealed the presence in his bodily fluids of phencyclidine, commonly known as PCP, a potent hallucinogen with pronounced behavioral toxicity. Rec. vol. V at 901. This drug has an unpredictable dose-response relationship and produces bizarre and frequently violent behavior in the user. *Id.* at 901–04. Seven expended cartridges, six of which were positively identified as being fired from Dixon's AR–18 rifle, were recovered, although defendants' firearms expert could not state with certainty when the cartridges were fired and plaintiff's witnesses testified that they heard only five or six shots fired. Some traces of nitrite and lead were found on the carpet where the incident occurred, and defendants' firearm expert testified

---

1. The officers thought the rifle was an M–16.

that this was consistent with the firing of a .223 caliber cartridge bullet (used in Dixon's AR–18 rifle) because the bullet frequently disintegrates upon impact. On direct examination, defendants' firearms expert did not think that the nitrite and lead traces were from any of the rounds fired from Borders' .357 service revolver because the floor would have been a secondary target, but on cross examination the expert admitted that he could not say with certainty from which firearm came the traces.

The trial focused on fourth and fourteenth amendment claims. Plaintiff claimed that Dixon was deprived of life and liberty without due process of law by the defendants, specifically that the individual defendants accomplished an unlawful seizure of Dixon marked by excessive force. Plaintiff also claimed that the individual defendants conspired to cover up this excessive use of force by giving false testimony and tampering with evidence at the scene. According to the plaintiff, the City of Lawton had a custom or policy of excessive force, brought about in part by a failure to screen, train and supervise its officers. Defendants' disputed these claims and contended that throughout the entire incident they were unable to obtain control of Dixon's AR–18 rifle and that deadly force was necessary and appropriate in order to preserve lives endangered by Dixon.

Concerning § 1985(3), the trial court instructed in pertinent part that: "You need consider the question of defendants' liability under the plaintiff's additional claim brought under Section 1985 only if you first find that a defendant is liable under Section 1983." Rec. vol. VII at 1403. Plaintiff's trial counsel properly objected:

> We object to the instruction that indicated you could only consider the 1985 action if a finding as to a 1983 violation—unless a finding to a 1983 violation was made out. We don't believe that to be the law. We believe the law is that they are separate and distinct causes of

action, neither are they dependent on the other.

*Id.* at 1424–25. On appeal, plaintiff claims that the instruction confused the jury and precluded jury consideration of rights protected by the thirteenth amendment.

We review a challenged jury instruction, not in isolation, but as part of the entire charge and in the context of the entire trial. *United States v. Park,* 421 U.S. 658, 674–75, 95 S.Ct. 1903, 1912–13, 44 L.Ed.2d 489 (1975); *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973). We must be satisfied that the jury instructions as a whole were "not misleading and contained an adequate statement of the law to guide the jury's determination." *Park,* 421 U.S. at 675, 95 S.Ct. at 1913.

As an initial matter, we note that our review of the trial court's instructions to the jury has not been enhanced by the state of this record. First, the district court docket sheet indicates that the hard copy of the district court's instructions, furnished to the jury for guidance, rec. vol. VII at 1422–23, did not remain filed and entered on the docket.[2] Accordingly, it is not part of the record on appeal. Moreover, we lack a recorded account of the genesis of these instructions. During trial, the judge indicated that he would meet with counsel in his library to settle instructions. *See, e.g.,* rec. vols. III at 499, VI at 1314. These meetings do not appear to have been of record; therefore, we lack a transcript. Finally, the comment of plaintiff's trial counsel concerning the court's methodology of settling instructions causes us some concern:

> Plaintiff's Counsel: Of course, we want to be sure the record is clear we are renewing our requested instructions, and I think the Court, through your law assistant, has taken that into consideration, but I'm not sure it's on the record anywhere.

---

**2.** The district court docket sheet contains the following notation with all but the last word been crossed out:

08-26-86   211   INSTRUCTIONS   to   jury (Thompson)  wf error. If initially filed and docketed in regular course, the instructions should not have been removed.

Rec. vol. VII at 1429. We discuss these points in hopes of simplifying the task of adequate appellate review.

■■■ A copy of the numbered instructions filed of record facilitates our review so we may better understand references to the instructions by the court and the parties. Frequently the district court will prepare and file *sua sponte* a copy of the court's instructions to the jury. If the court has prepared such a copy, but has not filed it, counsel should consider requesting that it be filed. We recognize that instruction conferences held in open court in civil cases need not be recorded if the parties agree and the judge approves, 28 U.S.C. § 753(b), and that instructions sometimes are discussed in chambers prior to making a record. *United States v. Weiner,* 578 F.2d 757, 789 (9th Cir.), *cert. denied,* 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978). However, we think that in those cases where disagreement about the instructions is anticipated, the better practice is to put instruction conferences on the record, even though these conferences precede final objections upon the instructions under Fed.R.Civ.P. 51. Finally, we have noted that it is the judge's sole responsibility to resolve issues concerning the instructions and that reliance upon law clerks for this function is improper. *United States v. Sloan,* 811 F.2d 1359, 1361–62 n. 2 (10th Cir.1987).

■■■ Turning to the merits of the § 1985(3) instruction, the district court's instruction is erroneous as a matter of law. There are several differences between § 1983 [3] and § 1985(3) [4] and it was error to precondition consideration of plaintiff's § 1985(3) claim upon a finding of § 1983 liability. Although neither § 1983 nor § 1985(3) create any substantive rights, a § 1983 claim generally describes a substantive violation of a right secured by the Constitution or laws, whereas a § 1985(3) claim generally describes a conspiracy of two or more persons for the purpose of depriving of another of equal protection of the laws or equal privileges and immunities under the laws. Section 1985(3) requires proof of a conspiracy, while § 1983 does not. *Harrison v. Springdale Water & Sewer Comm'n,* 780 F.2d 1422, 1430 n. 14 (8th Cir.1986); *Bell v. City of Milwaukee,* 746 F.2d 1205, 1255 n. 64 (7th Cir.1984). Section 1983 requires that a defendant have acted under color of state law, while § 1985(3) does not. *Griffin v. Breckenridge,* 403 U.S. 88, 99, 91 S.Ct. 1790, 1796–97, 29 L.Ed.2d 338 (1971). Finally, § 1985(3) requires proof that a conspirator's action was motivated by a class-based, invidiously discriminatory animus; there is no such requirement under § 1983. *Griffin,* 403 U.S. at 102, 91 S.Ct. at 1798; *Cassettari v. Nevada County,* 824 F.2d 735, 739–40 (9th Cir.1987). Thus, section 1985(3) provides for redress of injuries which result from private conspiracies driven by "some racial or otherwise class–based discriminatory animus." *Griffin,* 403 U.S. at 102, 91 S.Ct. at 1798; *Fisher v. Shamburg,* 624 F.2d 156, 158 (10th Cir. 1980). A § 1985(3) private conspiracy motivated by racial concerns "must aim at a

---

**3.** 42 U.S.C. § 1983 provides in pertinent part: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**4.** 42 U.S.C. § 1985(3) provides in pertinent part: If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

deprivation of the equal enjoyment of rights secured by the law to all." *Griffin*, 403 U.S. at 102, 91 S.Ct. at 1798.

Plaintiff points out that one of the sources of congressional power to enact § 1985(3), a statute which reaches private conspiracies, was the thirteenth amendment.[5] *See Griffin*, 403 U.S. at 104–07, 91 S.Ct. at 1799–01. The thirteenth amendment empowers Congress "to determine what are the badges and incidents of slavery, and the authority to translate that determination into effective legislation." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 440, 88 S.Ct. 2186, 2203–04, 20 L.Ed.2d 1189 (1968). Section 1985(3) assists in accomplishing that end by providing a remedy. Applying the thirteenth amendment and § 1985(3), we have held that a racially motivated conspiracy to interfere with a minority person's right to public accommodations is actionable. *Fisher*, 624 F.2d at 159.

■ According to plaintiff, the difficulty with the district court's § 1985(3) instruction is that it renders thirteenth amendment rights vindicated under § 1985(3) "virtually impotent" and subordinate to fourteenth amendment rights vindicated under § 1983. Appellant's Brief at 11. This argument is flawed in two respects. First, § 1983 and § 1985(3) do not create independent substantive rights; they are procedural statutes which provide a remedy for deprivation of existing rights. *Great Am. Fed. Sav. & Loan v. Novotny*, 442 U.S. 366, 372, 376, 99 S.Ct. 2345, 2349, 2351, 60 L.Ed.2d 957 (1979) (interpreting § 1985(3)); *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617–18, 99 S.Ct. 1905, 1916, 60 L.Ed.2d 508 (1979) (interpreting § 1983); *Holmes v. Finney*, 631 F.2d 150, 154 (10th Cir.1980). Second, the complaint never mentioned the thirteenth amendment as a basis of liability, *see* rec. vol. I doc. 2 at 2 (paragraph in complaint listing specific constitutional provisions implicated), and our review of the record convinces us that the plaintiff's claims proven at trial were grounded in the fourth and fourteenth amendments.

■ We note that the district judge struggled with whether to grant a directed verdict on plaintiff's § 1985(3) conspiracy claim and wanted the record to reflect his "serious misgivings" about it. Rec. vol. IV at 644, 1328–29. These misgivings were well placed because testimony and physical evidence concerning alleged racial incidents which were central to plaintiff's § 1985(3) claim, *see* rec. vol. V at 791, repeatedly were ruled inadmissible. *See, e.g.*, rec. vol. IV at 624–34, vol. V at 796–99. These rulings have not been challenged on appeal. Applying the directed verdict standard under Fed.R.Civ.P. 50(a) after considering the *admissible evidence* (which does not include inflammatory rhetoric by plaintiff's trial counsel), and recognizing that a scintilla of evidence on the § 1985(3) claim was insufficient to withstand defendants' motions for a directed verdict, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986), the defendants were entitled to a directed verdict on the § 1985(3) claim because of a lack of evidence tending to show a racially based, invidiously discriminatory animus behind the defendants' actions. *See Griffin*, 403 U.S. at 102, 91 S.Ct. at 1798.

■ Regarding a conspiracy claim, we think that plaintiff recognized the problems with the § 1985(3) claim. After plaintiff rested, the court asked plaintiff to explain how the evidence was sufficient to withstand the defendants' directed verdict motions on the § 1985(3) claim. Rec. vol. IV at 638. In response, plaintiff's trial counsel correctly stated: "I believe we have a [§] 1983 conspiracy." *Id.* He then moved to conform the pleadings to the proof without objection. *Id.; see also* Fed.R.Civ.P. 15(b). We agree with plaintiff that the

---

**5.** U.S. Const. am. XIII provides:
   § 1. Slavery prohibited.
   Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.
   § 2. Power to enforce amendment.
   Congress shall have power to enforce this article by appropriate legislation.

evidence was sufficient to withstand a directed verdict on § 1983 conspiracy claim.[6] However, no instruction was tendered to the court on this theory, no objection was made to the court's instructions as inadequate on this theory, *see* Fed.R.Civ.P. 51, and this issue has not been raised or briefed by plaintiff's appellate counsel. Thus, this case differs from *Cameo Convalescent Center v. Senn,* 738 F.2d 836, 840–43 (7th Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 780, 83 L.Ed.2d 775 (1985), where the district court's failure to give a *requested* jury instruction on conspiracy under § 1983 resulted in reversible error.

Apart from having waived the issue,[7] any error in failing to submit a § 1983 conspiracy theory to the jury was harmless, given the jury's apparent conclusion that none of these defendants violated Dixon's constitutional rights through the use of excessive force. What remains of plaintiff's claims thereafter is insufficient to support a § 1983 conspiracy claim; for in addition to proving an agreement, plaintiff was required to prove an actual deprivation of a right "secured by the Constitution and laws," 42 U.S.C. § 1983. *Earle v.*

*Benoit,* 850 F.2d 836, 845 (1st Cir.1988); *Villanueva v. McInnis,* 723 F.2d 414, 418–19 (5th Cir.1984). Thus, we join those courts which have recognized that to recover under a § 1983 conspiracy theory, a plaintiff must plead and prove not only a conspiracy, but also an actual deprivation of rights; pleading and proof of one without the other will be insufficient. *Landrigan v. City of Warwick,* 628 F.2d 736, 742–43 (1st Cir.1980); *see also Kaplan v. Clear Lake City Water Auth.,* 794 F.2d 1059, 1065 (5th Cir.1986); *Farrar v. Cain,* 756 F.2d 1148, 1151 (5th Cir.1985); *Dooley v. Reiss,* 736 F.2d 1392, 1395 (9th Cir.), *cert. denied,* 469 U.S. 1038, 105 S.Ct. 518, 83 L.Ed.2d 407 (1984); *Hampton v. Hanrahan,* 600 F.2d 600, 622–23 (7th Cir.1979), *rev'd in part on other grounds,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980). This is because the essence of a § 1983 claim is the deprivation of the right rather than the conspiracy. *Lesser v. Braniff Airways, Inc.,* 518 F.2d 538, 540 n. 2 (7th Cir.1975).

Finally, plaintiff claims that the trial court erred in admitting certain information contained in Dixon's medical

**6.** By a § 1983 conspiracy claim, we mean a conspiracy to violate a right protected by § 1983; in other words, a conspiracy to deprive a plaintiff of a constitutional or federally protected right under color of state law. *Strength v. Hubert,* 854 F.2d 421, 425 (11th Cir.1988); *see, e.g., Ratliff v. City of Milwaukee,* 795 F.2d 612, 628 (7th Cir.1986) (conspiracy to retaliate against a person for exercise of first and fourteenth amendment rights remediable under § 1983); *Cameo Convalescent Center v. Senn,* 738 F.2d 836, 840–43 (7th Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 780, 83 L.Ed.2d 775 (1985) (conspiracy to prosecute meritless claims and deny hearing on appeal remediable under § 1983).

A § 1983 conspiracy claim may arise when a private actor conspires with state actor to deprive a person of a constitutional right under color of state law. *See Dennis v. Sparks,* 449 U.S. 24, 29, 101 S.Ct. 183, 187, 66 L.Ed.2d 185 (1980); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 149–52, 90 S.Ct. 1598, 1603–06, 26 L.Ed.2d 142 (1970). The conspiracy provides the requisite color of state law under § 1983.

A § 1983 conspiracy claim also may arise when a plaintiff does not wish to rely exclusively on § 1985(3) with its requirement of class-based, discriminatory animus. For example, a plaintiff might be unable to prove a racially

motivated conspiracy, but could prove a conspiracy to deprive the plaintiff of civil rights under color of state law. *Klingele v. Eikenberry,* 849 F.2d 409, 413 (9th Cir.1988); *Helton v. Clements,* 832 F.2d 332, 338 (5th Cir.1987); *Harrison v. Springdale Water & Sewer Comm'n,* 780 F.2d 1422, 1430 n. 14 (8th Cir.1986).

Provided that there is an underlying constitutional deprivation, the conspiracy claim allows for imputed liability; a plaintiff may be able to impose liability on one defendant for the actions of another performed in the course of the conspiracy. *Landrigan v. City of Warwick,* 628 F.2d 736, 742 (1st Cir.1980); *Ryland v. Shapiro,* 708 F.2d 967, 974 (5th Cir.1983).

**7.** Along the same lines of waiver, we note that plaintiff's appellate counsel has not raised the issue of the trial court's instructing on qualified immunity over the objection of both plaintiff and defendants. *See* rec. vol. VII at 1400–01 (instruction on qualified immunity); *id.* at 1424, 1427 (objections). Although plaintiff's docketing statement indicates a general intention to appeal jury instructions, any issue concerning this particular instruction was not briefed, *see* Fed.R.App.P. 28(a), and we deem it abandoned. *Collins v. City of San Diego,* 841 F.2d 337, 339 (9th Cir.1988); *Bledsoe v. Garcia,* 742 F.2d 1237, 1244 (10th Cir.1984).

records from a community mental health center. Approximately one month before the incident in question, Dixon had sought treatment as an inpatient, but left within 24 hours. Defendants offered the information in response to plaintiff's evidence tending to show that Dixon did not use drugs and did not have psychological problems. *See* rec. vol. VI at 1099–1100. The medical records contain Dixon's response to a question concerning whether he used any "street drugs." Dixon answered affirmatively, indicated the type as "everything but heroin," and indicated that the frequency of use was "occasionally." Addendum to Appellant's Brief, def. ex. 15. The medical records also contain a screening report from triage, taken by a staff member of the mental health center, which discusses Dixon's admitted propensity to engage in violent behavior to gain attention, including an incident in which he threatened to shoot his wife and himself. *Id.* The district court determined that the information con-. tained in the medical records was relevant and probative, rec. vol. VI at 1288, vol. VII at 1323, and the issue before us is whether these records are privileged.

Whether a psychotherapist-patient privilege exists in this circuit pursuant to federal common law as interpreted "in the light of reason and experience," Fed.R.Evid. 501, remains undecided. *United States v. Crews*, 781 F.2d 826, 830–31 (10th Cir.1986) (per curiam). We note that such a privilege has been recognized in the Sixth Circuit, *In re Zuniga*, 714 F.2d 632, 639 (6th Cir.), *cert. denied*, 464 U.S. 983, 104 S.Ct. 426, 78 L.Ed.2d 361 (1983), and adopted by statute in Oklahoma. Okla.Stat.Ann. tit. 12, § 2503 (West 1980). The psychotherapist-patient privilege has been rejected by other circuits. *United States v. Corona*, 849 F.2d 562, 567 (11th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1542, 103 L.Ed.2d 846 (1989); *United States v. Meagher*, 531 F.2d 752, 753 (5th Cir.), *cert. denied*, 429 U.S. 853, 97 S.Ct. 146, 50 L.Ed.2d 128 (1976). Once again, however, we need not decide whether to recognize a federal common law psychotherapist-patient privilege in this circuit. *See Crews*, 781 F.2d at 831. Assuming, without decid-

ing, that such a privilege does exist, we would look to Supreme Court Model Rule and hold that the privilege does not apply in these circumstances.

Model Rule 504, proposed by the Judicial Conference Advisory Committee on Rules of Evidence and the Supreme Court but not enacted by Congress, would have created a psychotherapist-patient privilege. *See* 56 F.R.D. 183, 240–44 (1972). Although a personal representative of a deceased patient may claim the privilege, there are exceptions. Model Rule 504 provided in pertinent part:

(d) Exceptions.

.     .     .     .     .

*(3) Condition an element of claim or defense.* There is no privilege under this rule as to communications relevant to an issue of the mental or emotional condition of the patient in any proceeding in which he relies upon the condition as an element of his claim or defense, or, after the patient's death, in any proceeding in which any party relies upon the condition as an element of his claim or defense.

*Id.* at 241. The Advisory Committee Note explained the rationale for the rule: "By injecting his condition into litigation, the patient must be said to waive the privilege, in fairness and to avoid abuses. Similar considerations prevail after the patient's death." *Id.* at 244; *see also* 2 D. Louisell & C. Mueller, *Federal Evidence* § 216 at 858 (1985) (discussing waiver or privilege).

Although the plaintiff apparently put Dixon's mental condition at issue by claiming emotional distress and seeking damages for "mental pain and suffering of the decedent prior to his death." rec. vol. I at 10, 13 (complaint), plaintiff argues that "claims of emotional distress or suffering should not be the basis for unlimited exposure of Dixon's previous mental health condition." Appellant's Brief at 22 (citing *In re Lifschutz*, 2 Cal.3d 415, 85 Cal.Rptr. 829, 843–44, 467 P.2d 557, 571–72 (1970)). We hardly think that the disclosure of these psychotherapist-patient communications constituted "unlimited exposure of Dixon's previous mental condition." These commu-

nications arise from Dixon's one-day stay at a mental health center approximately one month before the incident in question. Thus, the communications at issue are brief, recent and directly related to issues necessarily injected into this lawsuit by the plaintiff.

Even if we viewed the subject matter of Dixon's communications to the psychotherapist as pertaining, not to an element of plaintiff's claim, but as pertaining only to the defense of this action, we would reach the same result. "After the patient's death, the privilege does not apply 'in any proceeding in which *any* party relies upon the condition as an element of his claim or defense' so that little scope remains for the personal representative's right to claim the privilege...." 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 504[07] at 504–35 (emphasis in original), *but see id.* at 504–35 n. 15 (criticizing model rule which would allow disclosure of psychotherapist-patient communications at the behest of adverse party after death of patient). We find the approach of the model rule to be a reasonable accommodation of the competing interests inherent in such privilege and in accordance with the above would find the privilege not applicable to the communications in this case. Accordingly, the admission of defendants' exhibit 15 was not error on the ground of privilege.

AFFIRMED.

GARTH, Circuit Judge, concurring:

Although I concur in almost all of the majority's opinion and in its judgment, I write separately because I do not agree with two significant statements that appear in the majority opinion, albeit as dicta.

On page 1448, the majority opinion characterizes as "correct" a statement by plaintiff's counsel that "I believe we have a [§] 1983 conspiracy." Further, on the same page, it concludes that "[w]e agree with plaintiff that the evidence was sufficient to withstand a directed verdict on § 1983 conspiracy claim." Thus, the majority finds a conspiracy to violate Dixon's constitutional rights protected by § 1983. But such a conspiracy was never pleaded. It also finds evidence of such a conspiracy in the record—evidence that was never adduced. Nor was any such claim or evidence even mentioned at oral argument.

Indeed, as even the majority opinion itself recognizes (at page 1449 and fn. 7), the issue of whether there was a conspiracy to violate § 1983 was never raised on this appeal. The only issues raised before us, as the majority opinion accurately recounts (at page 1444), were: the district court's error in its § 1985(3) instruction, and the admission of psychotherapist-patient communications. The court has appropriately and correctly addressed and analyzed both of those claims. And, in the absence of extraordinary circumstances, none of which appear here, we are foreclosed from entertaining issues not presented to us as issues on appeal. *Adams–Arapahoe Joint School District No. 28–J v. Continental Insurance*, 891 F.2d 772, 776 (10th Cir. 1989) ("an issue not included in either the docketing statement or the statement of issues in the party's initial brief is waived on appeal"). *See also, Braley v. Campbell*, 832 F.2d 1504, 1508 (10th Cir.1987) (en banc); *Bledsoe v. Garcia*, 742 F.2d 1237, 1244 (10th Cir.1984).

Moreover, my reading of the record and of the majority opinion (at 1444–1446), which graphically recites the relevant facts giving rise to this action (in particular, the circumstances of the police department responding to an emergency call) discloses no evidence of any such conspiracy—even if one had been pleaded and raised as an issue on this appeal. Thus, even though the majority correctly rules in the defendants' favor on this issue, I cannot subscribe to that portion of its opinion which declares that the plaintiff stated a conspiracy to violate Dixon's constitutional rights under § 1983 and offered evidence to that effect. In all other respects, I join the majority.