Brian D. MILLER, Plaintiff,

v.

Charles MADDOX, Vernon Jordan, Robert Carlile, Galen Marble, Ron Thornburg, individually and in their official capacities, and The City of Liberal, Kansas, Defendants.

No. 97–1549–JTM.

United States District Court,
D. Kansas.

May 28, 1999.

---

*MEMORANDUM AND ORDER*

MARTEN, District Judge.

Plaintiff has asserted six causes of action against the defendants stemming from his employment with the City of Liberal's ("City") police department: a 42 U.S.C. § 1981 race discrimination claim against all defendants; a 42 U.S.C. § 1983 claim against all defendants except Ron Thornburg; a 42 U.S.C. § 1985 conspiracy claim against all defendants except the City and Thornburg; a 42 U.S.C. § 1986 negligence claim against Thornburg and the City; a Title VII discrimination claim against the City; and a Title VII retaliation claim against the City.

Defendants Charles Maddox, Vernon Jordan, Robert Carlile, Thornburg and the City have joined together in filing a motion for summary judgment, and defendant Marble has filed a motion for summary judgment. The defendants have also filed motions to strike plaintiff's response. The parties have fully briefed the matter and appeared before the court on March 29, 1999, to present oral arguments. After examining the parties' briefs and considering their oral arguments, the court is prepared to rule. The defendants' motions to strike plaintiff's response are denied. Under the Federal Rules of Civil Procedure, plaintiff's response was timely. *See* Fed. R.Civ.P. 6(a) (excluding legal holidays from the computation period); Fed. R.Civ.P. 6(e) (allowing three additional days for a party to respond if it has been served by mail). With respect to the summary judgment motions, Marble's motion for summary judgment is granted, and the other defendants' motion is denied in part and granted in part as set forth below.

## I. Facts

Plaintiff Brian Miller is a 33 year old black male. He was born and grew up in Kansas City, Missouri. He obtained an Associate Degree in Criminal Justice from Garden City Community College. Plaintiff moved to Liberal, Kansas in April 1988 when he was hired by the Liberal police department ("LPD"). At all times relevant to this lawsuit, plaintiff has served as an officer for the LPD and continues to serve in that capacity.

Several men have held the position of Chief of Police of the LPD since plaintiff's arrival. Tom Hinsdale was Chief of Police until he was reassigned to another position in July 1994. At that time, Tom Anderson became the Acting Chief. In December 1994, Acting Chief Anderson stepped down and Captain Vernon Ralston was appointed Acting Chief. In February 1996, Vernon Jordan was appointed Chief of Police. Jordan is the only police chief plaintiff has sued in this case.

In 1989, plaintiff arrested Ronald "Buster" Carlile for obstruction of a law enforcement officer in the performance of his duties.[1] Buster Carlile is the brother of the defendant Robert Carlile, who currently serves as a member of the Liberal city commission. Plaintiff believes Robert Carlile remains angry with him for arresting his brother, and that he continues to want plaintiff fired because of the arrest.

In October 1990, plaintiff filed a race discrimination complaint against the City and Captain Charles Maddox with the Kansas Commission on Civil Rights (KCCR). At all times relevant to this action, Maddox has been a Captain in the LPD. Plaintiff's complaints were based upon an alleged course of discrimination and harassment against him by Maddox resulting in discriminatory treatment of plaintiff based on his race or color. The alleged course of conduct included attempted reprimands, surveillance, unwarranted scrutiny and criticism unequal to that given to white police officers, specific orders to plaintiff's immediate supervisors not to permit a white female animal control officer to ride with plaintiff, and specific instructions to plaintiff that he was not to speak with the white female while on duty. In October 1992, plaintiff's complaint was resolved through a settlement agreement brokered by the KCCR in which plaintiff received no money and the City admitted no wrongdoing.

In the spring of 1992, Captain Maddox contacted plaintiff and asked if he would be interested in transferring to the investigations division of the police department from operations ("patrol"). Plaintiff agreed and was transferred to investigations in April 1992. There is no distinction in rank between the investigations and patrol divisions of the LPD. Plaintiff acknowledged as much in his deposition in this case.[2] Likewise, plaintiff's pay did not increase because of his transfer to investigations. In investigations, plaintiff did receive a clothing allowance, but this was simply to reimburse him for the clothes he wore to work. As an officer in patrol, the police department supplied plaintiff with a uniform. Plaintiff also received the use of an unmarked car while in investigations. However, this was to be driven for work purposes only.

In 1993, plaintiff became acquainted with Cynthia Aumiller, a member of the police department's Explorer post. Aumiller was a member of the Explorer Scouts because her father had asked Maddox, his friend, to assist her in finding some direction and positive influence for her life.

1. According to plaintiff, at the time he arrested Buster Carlile, Buster called him a "sorry nigger," and told him that he "didn't know what in the fuck he was doing," that "the worst thing the City ever did was hire a nigger to be a cop," that "he was going to have his ass," and that he wanted Tom Anderson and Captain Maddox at the station when they got there. Martin Dep. at 33. As disgusting as Buster Carlile's words are, they have no relevance because plaintiff has not sued Buster Carlile.

2. Although there is no difference in rank, plaintiff claims the detective position is a more prestigious position.

Plaintiff and Aumiller became friends, and Aumiller visited plaintiff's home on several occasions. They also exchanged numerous phone calls. According to plaintiff, Aumiller wanted a romantic relationship with him.

Sometime in 1994, at the request of Aumiller's parents, Captain Ralston conducted an internal affairs investigation into plaintiff's relationship with Aumiller. According to plaintiff, Aumiller's father was upset because he thought his daughter, who was white, was dating plaintiff, a black man. At Ralston's request, Captain Maddox accompanied him to interview Aumiller at the Liberal airport. Aumiller denied any sexual relationship.

In August 1994, plaintiff himself initiated an interview with the LPD command staff regarding his relationship with Aumiller. Plaintiff contacted Captain Maddox, who told him he needed to contact acting Chief Anderson. Plaintiff called Anderson and disclosed to him that Aumiller wanted a sexual relationship with him. Neither Maddox nor anyone else from the LPD took any disciplinary action against plaintiff as a result of this interview.

In October 1994, acting Chief Anderson transferred plaintiff from investigations to patrol, and in November 1994, he transferred plaintiff back to investigations. Plaintiff does not believe Anderson possessed a discriminatory or retaliatory motive in taking these actions.

At some point around this time, Aumiller took an overdose of pills and was admitted to the local hospital. At that time, Captain Maddox learned Aumiller was alleging plaintiff had assaulted her with a gun.

In August 1995, plaintiff was appointed to a law enforcement advisory committee of the Kansas Attorney General ("Committee"). He remains a member of that Committee. Plaintiff is not compensated to serve on the Committee. To date, the Committee has met only seven times. Five of these meetings occurred during Jordan's tenure as Liberal's police chief. Plaintiff alleges that Chief Jordan denied him time off to attend these meetings, but on the only specific occasion plaintiff can remember, Jordan explained to him that a manpower shortage at the LPD prevented him from giving plaintiff time off.

After learning of plaintiff's appointment to the Committee, defendant Carlile spoke with Ralston, who was Acting Chief of Police. When he learned Ralston did not know why plaintiff had been appointed to the Committee, Carlile called the Attorney General's office to request an explanation. The Attorney General's office informed him that a local Liberal attorney, Bradley Ambrosier, had recommended plaintiff for the appointment. Carlile then called Ambrosier and told him any recommendation should have gone through the LPD. According to Ambrosier, Carlile did not use any racial slurs or overtones in his conversation with him.[3] At about this same time, Carlile's brother, Don Carlile, Director of Transportation for the Kansas Corporation Commission, called Maddox and KBI Director Larry Welch wanting a background check on plaintiff.[4] Also during this time, defendant Carlile encountered Chief Ralston at the local Wal–Mart store and spoke

---

**3.** Plaintiff claims that while Carlile may not have used racial slurs in this particular conversation he has been known to in the past. For example, he has referred to City Commissioner, Ivanhoe Love, now Mayor, as a "nigger," and in the presence of Mr. Love, Carlile would tell "racial jokes" behind the City Commission chambers, creating tension. In addition, during the summer of 1997 or 1998, Carlile said to Maddox, referring to plaintiff, "Black S.O.B. should have been fired and shouldn't be there." Maddox Dep. at p. 49.

**4.** After Don Carlile read about plaintiff's appointment to the Committee, he called Maddox and asked if the department had ever performed a background check on plaintiff. Apparently, the former chief of police had not done one or the department had lost it. Don Carlile claims he had heard "rumors about Garden City and different things that happened." Don Carlile Dep. at 10. Aumiller's father had also voiced his concerns to Don Carlile about his daughter dating plaintiff.

with him regarding plaintiff. According to Ralston, Carlile wanted plaintiff fired and called him a "black son-of-a-bitch." Ralston Dep. at 10. Ralston understood that defendant Carlile wanted plaintiff fired because of Buster Carlile's earlier arrest. Ralston refused to fire plaintiff, and in any event, only the city manager, Ron Thornburg, possessed the authority to dismiss City personnel.

During this time frame, Aumiller, along with local rape crisis counselors, Gretchen Loucks and Joyce Hassell, approached assistant county attorney Russell Hasenbank with a complaint against plaintiff. Aumiller alleged, among other things, that plaintiff had taken her out to the country and put a gun in her mouth. Aumiller did not want to go to the LPD with her complaint, but instead wanted to meet with plaintiff. Against his better judgment, Hasenbank arranged a meeting between Aumiller and plaintiff. Aumiller restated her accusations, which plaintiff denied. Plaintiff ended the encounter by getting up and leaving. Hasenbank related the results of this meeting to Captain Maddox and acting Chief Ralston.

In October 1995, acting Chief Ralston transferred plaintiff from investigations to patrol due to a manpower shortage. According to plaintiff, the LPD always seems to be short-staffed. Plaintiff did not receive a pay cut, and he did not consider the transfer a demotion. Plaintiff does not believe Ralston possessed any discriminatory or retaliatory motive toward him.

Shortly after Jordan arrived in February 1996, defendant Carlile approached him in the hall of the police department and told him about plaintiff's arrest of Buster Carlile in 1989. Jordan informed Carlile that he (Jordan) was "a new kid on the block, that was old hat, it did not concern [him], and that [he] would make [his own] opinion of all employees on their performance from this day forward." Jordan Dep. at 26.

One of Jordan's first acts as police chief was to transfer Captain Maddox to investigations. At that time, plaintiff was as-signed to patrol but was officing in the investigations area. With Maddox's transfer to investigations, plaintiff had to give up the use of an unmarked car and a desk in the investigations office.

On February 9, 1996, at approximately 2:00 a.m., a confrontation between plaintiff and Aumiller occurred at the Seward County sheriff's department. According to plaintiff, he noticed Aumiller following him in her car, so he "whipped around behind her" and began following her. Miller Dep. at 143. Plaintiff proceeded to the police department, and when he left from there, he noticed Aumiller's car parked at the sheriff's department. Plaintiff walked into the sheriff's department and confronted Aumiller with: "So what kind of fantastic line are you in here telling them today?" *Id.* at 145.

According to plaintiff, Aumiller seemed stressed. He described Aumiller as "hysterical" and himself as "kind of chuckling." *Id.* at 148. Eventually, plaintiff requested that Chief Jordan come to the sheriff's department. Jordan and Captains Ralston and Maddox arrived shortly thereafter. Aumiller accused plaintiff of following her. After Aumiller left the sheriff's department, plaintiff, Jordan, Ralston and Maddox all went to the police station to discuss the matter. During this discussion, plaintiff felt like Maddox stuck up for him. No disciplinary action against plaintiff occurred as a result of the sheriff's department incident.

According to plaintiff, all during this time, Aumiller persisted in expressing her desire to pursue a romantic relationship with him. Aumiller would go to his house and bang on his doors and windows. Sometime in 1996, plaintiff forcefully ejected Aumiller from his residence. He described himself as angry and Aumiller as emotionally distraught at the time this happened. Plaintiff described at least some of these incidents to Captain Ralston.

On or about June 26, 1996, a former police intern, Jeff Martin, approached Captain Maddox with complaints about plain-

tiff. During this interview, Martin accused plaintiff of being physically abusive toward a number of women living in Liberal, including Cynthia Aumiller.

Because Martin had made criminal allegations against plaintiff, Maddox took this information to Chief Jordan. Jordan concluded it was necessary to resolve the Aumiller/Miller issue once and for all. Concerned by the seriousness of the charges and the fact one of his officers was allegedly involved in criminal activities, and after seeking and obtaining legal advice from the city attorney, Jordan determined that an outside agency should investigate so there would be no appearance of impropriety or cover-up on the part of the LPD. Accordingly, Jordan contacted the Kansas Bureau of Investigation (KBI).[5]

Agent Galen Marble of the KBI assumed primary responsibility for the investigation of plaintiff. In July 1996, he met with Chief Jordan, Captain Maddox and his supervisor at the KBI, John Green, to discuss the case. During this meeting, Maddox related to Marble the results of previous investigations into the Miller/Aumiller matter and told him that nothing could ever be substantiated. Jordan told Marble "an outside investigation was needed to clear it [the allegations] up one way or another." Marble Dep. at 17.

Marble formally commenced his investigation on August 12, 1996, one week after Jordan and Thornburg allegedly forced Captain Ralston to retire. On that same day, Jordan placed plaintiff on paid administrative leave. At some point, Maddox

and Jordan discussed the fact that, if plaintiff had committed a domestic violence battery, he would be ineligible to serve as a police officer under federal law. According to plaintiff, Marble also knew from the outset that if he could prove the allegations against plaintiff, it would be career-ending for plaintiff because of the Violence Against Women Act.

The purpose of Agent Marble's investigation was to determine whether plaintiff had had sex with Aumiller while she was under the age of sixteen, whether he had physically abused Aumiller, and whether he had physically abused any of his girl-friends.[6] As part of his investigation, Agent Marble interviewed Aumiller. During this interview, Aumiller denied any sexual relationship with plaintiff and further denied that he had physically or sexually assaulted her. However, she did admit to making such allegations in the past.

Captain Maddox sat in on Agent Marble's interviews of Aumiller and Martin. He also drove Agent Marble to a witness's residence so he could interview her. At Agent Marble's request, Maddox notified him when plaintiff left town. Other than this, Maddox played no active part in Marble's investigation.

Plaintiff's administrative leave lasted one day. Agent Marble was unable to substantiate the allegations against plaintiff at that time. On August 14, 1996, Chief Jordan reinstated plaintiff and placed him in investigations under Captain Maddox. Captain Maddox told plaintiff

---

5. Martin later admitted he was angry with plaintiff because someone had told him plaintiff was having an affair with his wife. He further admitted that all of the information he supplied to Maddox was false or based on hearsay only. He had no personal knowledge of the allegations he had made.

According to Martin, Maddox later asked him to meet with a KBI agent regarding the allegations against plaintiff. Martin did not keep two appointments Maddox made for him to meet with the KBI agent. In August 1996, police arrested Martin for his involvement in a fistfight. After Martin spent the weekend in jail, Maddox allegedly came and got him, had

him handcuffed and ankle-shackled, and escorted him to be interviewed by Agent Marble of the KBI. Maddox allegedly told Martin that they might be able to help him if he would help them.

6. Stacy Wyckoff, who had been employed by the LPD as a police officer, asked Marble during his interview why he thought she had a relationship with plaintiff, to which Marble replied, "You fit the description (or profile); he likes blond-haired white girls with a nice tan." Wyckoff Aff. at ¶ 6. Marble denies that he made this statement.

"he was glad that this deal was over." Miller Dep. at 240.

According to plaintiff, he continued to have contact with Aumiller after August 13, 1996. Aumiller continued to go to plaintiff's house. At this time, plaintiff knew the KBI's investigation involved Aumiller.

In late August 1996, Cynthia Aumiller attempted to commit suicide a second time. Aumiller called plaintiff and threatened to take an overdose of pills. Later, she showed up at his house, foaming at the mouth. Plaintiff did not take her to the hospital, but rather asked his roommate to accompany her because he "didn't want any trouble." Miller Dep. at 258. Plaintiff later contacted Aumiller at the hospital.

Approximately one month after Aumiller's second suicide attempt, various law enforcement and governmental agencies, including the Kansas Attorney General's Office and the LPD, received an anonymous letter from a "Scared Single Mom" accusing plaintiff of physical abuse toward women. Plaintiff believes one of the defendants wrote the letter, but there is no evidence before the court to support this belief.

Agent Marble continued his investigation after Aumiller's second suicide attempt and the "Scared Single Mom" letter had been circulated. During this period of time, the KBI obtained plaintiff's telephone records. Plaintiff claims the subpoenas used to obtain the records were all untruthfully captioned: "In the matter of an inquisition conducted pursuant to K.S.A. 22–3101(2), the Attorney General having knowledge of an alleged violation in this state pertaining to narcotic or dangerous drugs." Plaintiff had never been accused of any crimes involving drugs. He premises his constitutional privacy, due process and equal protection claims on this action.

On December 17, 1996, Agent Marble scheduled an interview with plaintiff at the Liberal Inn. This interview did not take place, because Marble failed to appear.

However, Chief Jordan was waiting in the hotel parking lot. Jordan asked plaintiff how he was doing, and plaintiff responded by telling Jordan he knew how he was doing and that "he [Jordan] didn't scare me with his little games." Miller Dep. at 272. Plaintiff's response concerned Jordan because he did not feel plaintiff was showing him proper respect as chief of police.

The next day, Jordan encountered plaintiff at the police station. Jordan greeted him, but plaintiff refused to respond. Shortly thereafter, plaintiff, through his attorney, sent City Manager Ron Thornburg a letter demanding that the KBI investigation end. Plaintiff also demanded that Chief Jordan and Captain Maddox stop surveilling his house. Thornburg lacked any authority to end the KBI investigation and determined that Jordan and Maddox were not surveilling plaintiff, but instead were merely complying with the KBI's request to be informed whenever plaintiff left town. Thornburg determined that the LPD was doing nothing wrong and, therefore, took no action.

On December 31, 1996, Agent Marble, along with KBI Agent Alan Sill, interviewed plaintiff regarding Aumiller's allegations. During this interview, both Marble and Sill asked plaintiff to take a polygraph examination, but plaintiff refused. Instead, plaintiff walked out of the interview "[b]ecause everything I was saying to them was going in this ear and out this ear and I was done talking to them." Miller Dep. III at 89.

On January 7, 1997, Chief Jordan verbally reprimanded plaintiff for not wearing a tie when he went to the courthouse. Later that day, Chief Jordan, after consulting with the city attorney, placed plaintiff on paid administrative leave for a second time, pending a fit-for-duty psychological examination. According to Jordan, his reasons for doing so had to do with the KBI investigation and plaintiff's rude and disrespectful behavior toward him. Jordan wanted to make sure that plaintiff was

"psychologically fit to be a police officer on the streets." Jordan Dep. at 109.

At the time Chief Jordan placed plaintiff on administrative leave, he informed plaintiff that he wanted him to take a psychological fit-for-duty examination. Jordan told plaintiff he would be asked questions about his relationship with Aumiller. On January 8, 1997, the day after he was placed on administrative leave, plaintiff filed a race discrimination complaint with the Kansas Human Rights Commission ("KHRC").

Plaintiff consulted with Dr. John Allen in Wichita, Kansas. Chief Jordan provided Dr. Allen with what he considered to be pertinent information, including a brief summary of the allegations against plaintiff, his acts of insubordination toward Jordan and plaintiff's complaints of physical pain.

On March 3, 1997, Dr. Allen gave plaintiff a release to return to work. Chief Jordan returned plaintiff to active duty, asking him where he wanted to be assigned. Plaintiff requested that he be assigned wherever the chief thought he would "best benefit the department." Miller Dep. at 295. Jordan assigned plaintiff to patrol. Plaintiff was having difficulty getting along with and being supervised by Captain Maddox. Jordan did not want to disrupt the investigations division, and so "for the good of the organization, for smoother running," he assigned plaintiff to patrol. Jordan Dep. at 110.

On March 20, 1997, the KBI closed its investigation into the Miller/Aumiller matter. At that time, Agent Marble met with the Seward County Attorney, Chief Jordan, and KBI agents Alan Sill and John Green. Marble told the county attorney he felt plaintiff was not being truthful about his relationship with Aumiller but that there was not enough evidence to support criminal charges. Marble's closing report reflected his opinion that plaintiff "had not been truthful on some of the things that he told investigators but it was nothing of a nature that would warrant charges." Pl.'s Exh. 67E (KBI Investiga-

tion Report). Plaintiff denies that he was untruthful or uncooperative with Marble, except to refuse to take a polygraph examination, which he had a right to do in a criminal investigation.

Agent Marble submitted his closing report to the City. In addition, both Marble and Chief Jordan kept City Manager Thornburg apprised of the progress of the investigation. Thornburg learned that plaintiff had been uncooperative during the investigation. Thornburg "felt this was inappropriate, because as a police officer, Miller should work to resolve criminal investigations, not thwart them." Thornburg Aff. at ¶ 4.

Plaintiff has several complaints about the way Agent Marble conducted his investigation. At the beginning of Marble's investigation in August 1996, he immediately verified that plaintiff did not even know Aumiller until she was sixteen, proving the "indecent liberties" allegation to be false. Yet, four months later, in December 1996, Marble listed "indecent liberties" as an allegation against plaintiff in the Standard Offense Report he completed. Agent Marble admits the Kansas Standard Offense Report should have been written at the beginning of the investigation. When he did get around to writing the report on December 10, 1996, he indicated the allegations were those given to him at the beginning of the investigation.

Plaintiff claims Marble failed to accurately report all exculpatory or exonerating statements others made about plaintiff. Marble claims he had no duty to include exculpatory evidence in his reports and that the argument that exculpatory evidence should be included in reports to the prosecutor does not matter when the Agent himself tells the prosecutor that there is no evidence to go on and the prosecutor does not file charges.

Plaintiff further claims Marble never contacted Hinsdale, Anderson or Ralston concerning prior internal investigations into plaintiff's relationship with Aumiller. Because the three men had investigated

prior allegations against plaintiff, plaintiff claims it would have been important to interview the three men before making a statement about plaintiff's truthfulness.

Plaintiff premises his freedom of association, due process, equal protection, privacy right and conspiracy claims on the facts surrounding the KBI's criminal investigation of him. In particular, he complains about the fact that the KBI obtained his phone records during the investigation, and that certain of his acquaintances were interviewed while others were not.

Plaintiff filed his complaint in this action on December 19, 1997. In March 1998, plaintiff did not receive a merit raise. Chief Jordan recommended him for one, but City Manager Thornburg felt plaintiff did not merit a raise because of his lack of cooperation with the KBI investigation.[7] Plaintiff was not the only police department employee who did not receive a raise at this time; certain white officers also did not receive a raise. Later in the year, plaintiff did receive a merit raise, approved by Thornburg and the Liberal City Commission.

Plaintiff has applied for two openings in investigations since March 3, 1997. Chief Jordan claims he selected qualified persons other than plaintiff to fill the positions. Jordan also claims he continued to be concerned about plaintiff's attitude toward him and Captain Maddox, as well as his lack of cooperation with the KBI.

Plaintiff has also applied for promotion to lieutenant two times since March 3, 1997. Tim Neal, who previously had been a lieutenant and thus possessed superior command experience to plaintiff, filled the first opening. Chief Jordan's concerns regarding Miller's attitude towards him as the chief, his (the chief's) command staff and the KBI all played a part in his decision not to promote plaintiff to this opening. The second opening has not been filled by anyone, due to budget restrictions.

Because of the various problems with the LPD, plaintiff has applied for work at the Wichita police department ("WPD"). Plaintiff disclosed the fact of the KBI investigation to his Wichita interviewers. The WPD performed its own investigation into the matter, in which Aumiller admitted to having a sexual relationship with plaintiff. Although Detective Moore of the WPD contends Aumiller made that statement, he found her untruthful. Plaintiff submitted to a polygraph examination for the WPD.[8]

According to the WPD, the LPD gave plaintiff a good recommendation. However, in his deposition, Ralston stated that

7. During a Liberal City Commission meeting, Thornburg voiced his opinion regarding potential employees who have filed lawsuits against the City (to the Mayor): "Are you suggesting that we would stoop to hiring employees who would—who would already have open suits against the City of Liberal? Now are you suggesting that we should support those people that sue the City?" Oct. 21, 1996 Liberal City Comm'n Mtg. Tr. at 21.

8. Plaintiff objects to the polygraph examination evidence under *Daubert*. At the time of the examination, Jack Reece, M.D., was treating plaintiff for anxiety, gastritis and headaches because of problems plaintiff was having at work. Dr. Reece testified that "any anxiety can cause trouble with a polygraph because a polygraph, it doesn't say anything about lying. All it does is report blood pressure, pulse, anxiety and the like. If you've already got it, it's just probably manifested

more." Reece Dep. at 13. The results of the polygraph are inadmissible, but the fact that the WPD considered the results in its decision not to hire plaintiff is admissible. *See, e.g.,* *Wyrick v. Fields*, 459 U.S. 42, 48, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982) ("Although the results of the polygraph examination might not have been admissible evidence, the statements Fields made in response to questioning during the course of the polygraph examination surely would have been."); *Palmer v. City of Monticello*, 31 F.3d 1499, 1506 (10th Cir. 1994) ("If it is relevant that the polygraph examination was performed, as a fact in and of itself, regardless of what the results were, then that fact may be admissible as an operative fact."); *United States v. Miller*, 874 F.2d 1255, 1261 (9th Cir.1989) ("[P]olygraph evidence might be admissible if it is introduced for a limited purpose that is unrelated to the substantive correctness of the results of the polygraph examination.").

someone in charge of recruitment at the WPD called him regarding plaintiff and the person he spoke to stated, "Well, I got some real bad reports from Vernon Jordan and Charles Maddox on him." Ralston Dep. at 52. Furthermore, Detective Moore from the WPD stated that Agent Marble told him plaintiff "was stonewalling him, was not cooperating in the investigation." Moore Dep. at 127. However, Detective Moore also stated in his deposition that the only negative information about plaintiff he remembers receiving was from a Mr. Wojdylak.[9]

Plaintiff also applied for work with the Los Angeles police department ("LAPD"). He received a provisional offer of employment from the LAPD, subject to the completion of a background investigation. The LAPD requested all of plaintiff's personnel and internal affairs files. Pursuant to his policy, Chief Jordan did not send these files to Los Angeles, but he did offer to let the LAPD inspect plaintiff's personnel file in Liberal.

Plaintiff also complains about a few oral confrontations he has had with Maddox and Jordan about such matters as calling in sick, coming in late for work, working overtime and professional attire. However, these incidents did not result in even a written reprimand. According to the defendants, white officers have received more formal discipline, including write-ups and suspensions, for transgressions similar to plaintiff's. Further, according to plaintiff, the entire investigations division had difficulty with Maddox's management style. The evidence before the court suggests Chief Jordan praised plaintiff when he performed well.

## II. Summary Judgment Standards

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *Jurasek v. Utah State Hosp.*, 158 F.3d 506, 510 (10th Cir.1998). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Baker v. Board of Regents*, 991 F.2d 628, 630 (10th Cir.1993). The moving party need not disprove the non-moving party's claim or defense; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must come forward with significant admissible probative evidence supporting that party's allegations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III. Analysis

### A. Race Discrimination

Plaintiff brings his race discrimination claims against the defendants under 42 U.S.C. § 1981[10] and 42 U.S.C. § 2000e–

---

9. None of the parties have provided information regarding Mr. Wojdylak.

10. Section 1981 provides:

2(a) (Title VII) [11]. Plaintiff's race discrimination claims require an identical analysis. *Randolph v. Board of Pub. Utils.*, 983 F.Supp. 1008, 1013 (D.Kan.1997) (citing *Aramburu v. The Boeing Co.*, 112 F.3d 1398, 1403 n. 3 (10th Cir.1997) (Title VII, § 1981, and KAAD); *Randle v. City of Aurora*, 69 F.3d 441, 450 (10th Cir.1995) (Title VII, § 1981 and § 1983)).

To state a prima facie case of race discrimination, plaintiff must show: (1) that he is a member of a racial minority; (2) that he suffered an adverse employment action; and (3) that similarly situated employees were treated differently. *Trujillo v. University of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1212 (10th Cir.1998). To establish a case of intentional discrimination, plaintiff has two options: he may satisfy his burden of proof by offering direct evidence of discriminatory intent or he may demonstrate such intent indirectly by following the *McDonnell Douglas*[12] burden-shifting framework. *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1509 (10th Cir. 1997).

To prevail by coming forth with direct evidence, "a plaintiff must introduce direct or circumstantial evidence that the alleged [discriminatory] motive 'actually relate[s] to the question of discrimination in the particular employment decision, not to the mere existence of other, potentially unrelated, forms of discrimination in the workplace.'" *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 550 (10th Cir.1999) (quoting *Thomas v. National Football League*

*Players Ass'n*, 131 F.3d 198, 204 (D.C.Cir. 1997)); *see also Thomas*, 111 F.3d at 1512 (holding that plaintiff may prove discriminatory motive by "presenting 'evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged [retaliatory] attitude.'") (quoting *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1471 n. 5 (10th Cir.1992)).

Plaintiff has failed to establish a prima facie case of discrimination based on "direct" evidence. Carlile apparently called plaintiff a "black son-of-a-bitch" on at least one occasion. However, plaintiff admits Carlile's animosity towards him stems from plaintiff's arrest of Carlile's brother. Furthermore, Carlile was not in a position to take employment actions against plaintiff. This is illustrated by his attempt to turn Jordan against plaintiff shortly after Jordan arrived at the LPD. Jordan informed Carlile he would make his own judgments regarding police officers. Jordan never fired plaintiff, even though Carlile made the request.

Plaintiff also points to the comment Agent Marble allegedly made to Wyckoff about her being plaintiff's type—white woman with a nice tan. Marble denies making this comment. Even if he did make the statement, it is not necessarily discriminatory. Further, that statement alone is insufficient to prove a prima facie case of discrimination because Marble was not in a decision-making position with re-

---

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**11.** Section 2000e–2(a) provides:
It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

**12.** *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

spect to plaintiff's employment. *See, e.g., Cianci v. Pettibone Corp.*, 152 F.3d 723, 727 (7th Cir.1998) ("However, 'before seemingly stray workplace remarks will qualify as direct evidence of discrimination, the plaintiff must show that the remarks were related to the employment decision in question.'") (quoting *Fuka v. Thomson Consumer Elecs.*, 82 F.3d 1397, 1403 (7th Cir.1996)); *Rivers–Frison v. Southeast Missouri Community Treatment Ctr.*, 133 F.3d 616, 619 (8th Cir.1998) (stray remarks that did not affect termination decision and that were made by non-decision makers were not direct evidence of discrimination); *Smith v. Data-Card Corp.*, 9 F.Supp.2d 1067, 1079 (D.Minn.1998) (stray remarks, statements by non-decision makers, or statements by decision makers unrelated to the decisional process are insufficient to establish a prima facie case of discrimination).

Because plaintiff is unable to show intentional discrimination directly, he must do so indirectly as set forth in *McDonnell Douglas.* Under the *McDonnell Douglas* framework, plaintiff has the initial burden of establishing a prima facie case of intentional discrimination. *Thomas*, 111 F.3d at 1509. If plaintiff meets his burden, the burden switches to the defendants to articulate a "'legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817). Once the defendant has set forth a facially nondiscriminatory explanation for the decision, "the factual inquiry proceeds to a new level of specificity." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). It then becomes the plaintiff's burden to show there is a genuine dispute of material fact as to whether the employer's proffered reason for the decision is a pretext for discrimination. *Thomas*, 111 F.3d at 1509.

Plaintiff claims the defendants discriminated against him based on the following acts: (1) by instituting and maintaining the KBI investigation; (2) by deciding to place plaintiff on paid administrative leave; (3) by transferring plaintiff from investiga-

tions to patrol; (4) by not promoting plaintiff to lieutenant; (5) by denying plaintiff a pay increase in early 1998; (6) by reacting negatively to plaintiff's appointment to the Committee; (7) by orally confronting plaintiff about his performance; and (8) by thwarting his efforts to obtain employment elsewhere.

■ Plaintiff can satisfy the first element of his race discrimination claim—he is a member of a racial minority. However, most of the actions about which he complains are not considered "adverse employment actions." The Tenth Circuit liberally construes the phrase "adverse employment action." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir.1998). "Such actions are not simply limited to monetary losses in the form of wages or benefits." *Id.* Instead, the Tenth Circuit takes a "case-by-case" approach, examining the unique factors relevant to the situation before it. *Id.* However, "'a mere inconvenience or an alteration of job responsibilities'" is not considered an adverse employment action. *Id.* (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993)); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633 (1998) (conduct is adverse employment action if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits").

■ Two of the actions mentioned above—the refusal to promote plaintiff to lieutenant and the pay increase denial—would be considered adverse employment actions. The others, however, do not amount to adverse employment actions. The KBI investigation was not an adverse employment action. It was, without question, at least an inconvenience for plaintiff, but the LPD had an obligation to investigate such serious allegations. Plaintiff admits as much in his response.

■ Jordan's two decisions to place plaintiff on administrative leave were also not adverse employment actions. On both occasions, plaintiff was paid for the time he was off. The first administrative leave lasted only one day. The second one lasted for two months, which is not an unreasonable amount of time, considering plaintiff's refusal to cooperate with the ongoing KBI investigation, his acts of insubordination towards Chief Jordan, and his complaints of physical pain.

■ Plaintiff's transfer to patrol was likewise not an adverse employment action. Plaintiff admitted there is no difference in rank or pay between patrol and investigations. He claims the detective position is more prestigious, but that alone is insufficient to establish an adverse employment action.

■ Further, Carlile's negative reaction to plaintiff's appointment to the Committee is definitely not an adverse employment action. Plaintiff's appointment to the Committee had no connection with his supervisory officers. Carlile's objections to plaintiff's appointment had no impact on plaintiff's status as a member of the Committee; plaintiff continues to serve on the Committee. In addition, it appears Chief Jordan may have refused to allow plaintiff to attend one meeting; however, his decision was based on a manpower shortage within the department rather than prejudice against plaintiff.

■ In addition, Maddox's and Jordan's various oral reprimands do not qualify as adverse employment actions. No disciplinary actions resulted from the reprimands.[13] *See Sanchez,* 164 F.3d at 533 ("Courts considering the issue have held that 'unsubstantiated oral reprimands' and 'unnecessary derogatory comments' such as those alleged here are not included within the definition of adverse action absent evidence that they had some impact on the employee's employment status.")

■ Finally, plaintiff's failure to obtain employment with the WPD and the LAPD does not constitute an adverse employment action. The defendants had no control over the decisions made by these organizations. The WPD conducted its own investigation of plaintiff's background. Based on that investigation, it determined not to hire plaintiff. The WPD claims plaintiff received a good recommendation from the LPD.

Pursuant to Chief Jordan's policy, he refused to send plaintiff's personnel file to the LAPD. This policy prevented further dissemination of plaintiff's records by requiring the LAPD to view plaintiff's files at the LPD. Plaintiff has not submitted any evidence to suggest Jordan allowed other agencies to view other officers' personnel files.

■ Plaintiff's failure to be promoted to lieutenant would satisfy the adverse employment action requirement. And, Thornburg's decision to deny plaintiff a pay increase in early 1998 also may be considered an adverse employment action, considering the Tenth Circuit's liberal definition of that phrase. *See Davis v. State Univ. of New York,* 802 F.2d 638, 642 (2d Cir.1986) (denial of merit increase considered adverse employment action); *but see Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 708 (5th Cir.1997) ("Likewise, the other events, such as ... the verbal threat of being fired, the reprimand for not being at her assigned station, a *missed pay increase,* and being placed on 'final warning,' do not constitute 'adverse employment actions' because of their lack of consequence.") (emphasis added).

Although plaintiff has satisfied the first two prongs of a race discrimination case with respect to the promotion and raise denials, he is unable to satisfy the third element. He has failed to show that he was treated differently than similarly situ-

---

**13.** Plaintiff does claim Jordan made him write a report explaining the reason for wearing his tie clipped to his collar. He claims many officers wore their ties in this manner

when they were not testifying in court. Although this may have inconvenienced plaintiff, it does not constitute an adverse employment action.

ated employees. Because plaintiff has failed to establish a prima facie case of race discrimination, the defendants' motions are granted with respect to plaintiff's § 1981 and Title VII claims.

## B. Retaliation

 Title VII prohibits an employer from discriminating against an employee in retaliation for opposing unlawful employment practices. 42 U.S.C. § 2000e–3(a).[14] To establish a prima facie case of retaliation under Title VII, plaintiff must show that "(1) he engaged in protected opposition to statutorily prohibited discrimination; (2) he was subjected to an adverse employment action subsequent to or contemporaneous with his protected opposition; and (3) a causal connection exists between the employer's adverse employment action and the employee's protected activity." *Trujillo*, 157 F.3d at 1215. "It is well settled that the burden of persuading the factfinder that the defendant intentionally discriminated remains at all times with the plaintiff." *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1263 (10th Cir.1998). In *Purrington v. University of Utah*, 996 F.2d 1025, 1033 (10th Cir.1993), the Tenth Circuit made it clear that a plaintiff must prove that the defendant's action was intentionally retaliatory. "A meritorious retaliation claim will stand even if the underlying discrimination claim fails." *Sanchez*, 164 F.3d at 533. As with his discrimination claims, plaintiff may establish his prima facie case directly or indirectly under the *McDonnell Douglas* framework. *Medlock*, 164 F.3d at 549–50. If plaintiff is able to put forth a prima facie case of retaliation, it then becomes the defendants' burden "to prove by a preponderance that it 'would have made the same decision' notwithstanding its retaliatory

motive." *Id.* (quoting *Thomas*, 111 F.3d at 1511); *see also Purrington*, 996 F.2d at 1033 ("If a prima facie case is established, the burden of production shifts, and the defendant must articulate a legitimate, nondiscriminatory reason for the adverse action.") " 'Once the defendant has dispelled the inference of retaliation by establishing a legitimate reason, "the plaintiff may still prevail if [he] demonstrates the articulated reason was a mere pretext for discrimination." ' " *Purrington*, 996 F.2d at 1033 (quoting *Anderson v. Phillips Petroleum Co.*, 861 F.2d 631, 634 (10th Cir.1988)).

As previously discussed, most of the actions of which plaintiff complains are not adverse employment actions.

Retaliatory conduct other than discharge or refusal to rehire is thus proscribed by Title VII only if it alters the employee's "compensation, terms, conditions, or privileges of employment," or "adversely affect[s] his [or her] status as an employee." It follows that "not everything that makes an employee unhappy" qualifies as retaliation, for "[o]therwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.' " *Sanchez*, 164 F.3d at 533. (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir.1997) (alteration in original) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996)).

 Jordan's refusal to promote plaintiff to lieutenant and Thornburg's decision to deny plaintiff a raise in early 1998 would be considered adverse employment actions with respect to his retaliation claims. Therefore, plaintiff satis-

---

**14.** Section 2000e–3(a) states:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

fies the first two elements of a retaliation claim: (1) he engaged in a protected activity by filing his complaint with the Kansas Human Rights Commission; and (2) he suffered adverse employment actions subsequent to his protected opposition. Plaintiff satisfies the third element with respect to Thornburg's decision not to give him a pay increase in early 1998, but does not satisfy the third element with regard to Jordan's decision not to promote him to lieutenant.

Jordan's refusal to promote plaintiff to lieutenant did occur after plaintiff filed his complaint with the Kansas Human Rights Commission on January 8, 1997. However, Jordan claims his decision was based on plaintiff's failure to cooperate with the KBI investigation, because of plaintiff's attitude, and because another officer was more qualified. Further, when plaintiff returned to work from his second administrative leave, which was only two months after he filed his complaint with the KHRC, Jordan asked him where he wanted to be assigned, an act which hardly illustrates a retaliatory motive. In addition, Jordan recommended that plaintiff receive a raise in 1998, which is also highly inconsistent with a retaliatory motive.

■ Plaintiff has put forth a prima facie case of retaliation based on Thornburg's refusal to give him a raise in early 1998. Thornburg justifies his decision based on plaintiff's failure to cooperate in the KBI investigation, which is a nondiscriminatory reason for his action. Plaintiff must then show that Thornburg's articulated reason was a mere pretext for retaliation. Plaintiff has come forth with evidence of Thornburg's opinion regarding the City's employment of those who have filed lawsuits against the City. See Oct. 21, 1996 Liberal City Comm'n Mtg. Tr. at 21. In addition, Thornburg denied plaintiff a raise even though Chief Jordan, who worked more closely with plaintiff, recommended a pay increase for plaintiff. This evidence is sufficient to defeat the City's motion for summary judgment on plaintiff's retaliation claim.

## C. § 1983 Deprivation of Constitutional Rights

Plaintiff claims the defendants have violated his constitutional rights, specifically, his freedom of association, his right to privacy, his right to equal protection and his right to due process. All of his alleged constitutional violations stem from the KBI's investigation.

Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' of the United States. Second, the plaintiff must show that the defendant deprived him of this constitutional right 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory.' This second element requires that the plaintiff show that the defendant acted 'under color of law.'

*Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

### 1. Claims Against the Individual Defendants

■ Plaintiff has failed to establish the first element of a § 1983 claim, *i.e.,* he has not shown that the defendants have deprived him of any constitutional rights. He bases his freedom of association claim on Marble's interviews of his acquaintances. However, he has not "sufficiently identified a person or group with whom his

right to associate was chilled." *Medina v. City of Osawatomie*, 992 F.Supp. 1269, 1273 (D.Kan.1998).

■ Likewise, plaintiff's right to privacy claim fails.

While the Constitution does not explicitly establish a right of privacy, the Supreme Court has recognized for nearly 100 years that a right of personal privacy does exist. *E.g., Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Union Pacific R.R. Co. v. Botsford*, 141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734 (1891). In a series of cases, the Court established a zone of privacy protected by the penumbra of a variety of provisions in the Bill of Rights. This penumbra protects two kinds of privacy interests: the individual's interest in avoiding disclosure of personal matters and the interest in being independent when making certain kinds of personal decisions. *Whalen v. Roe*, 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977). The first interest protects the individual from governmental inquiry into matters in which it does not have a legitimate and proper interest. *Id.*

*Eastwood v. Department of Corrections*, 846 F.2d 627, 630–31 (10th Cir.1988) (footnote omitted). Although, plaintiff has an interest in avoiding disclosure of personal matters, *e.g.,* facts about his relationships with women, the LPD also had a legitimate reason for requesting the KBI investigation. The allegations against plaintiff were very serious and had been made on more than one occasion and by more than one person. To adequately conduct its investigation, the KBI needed plaintiff's telephone records, and they needed to contact his acquaintances who may have had information about the allegations.

■ Plaintiff has also failed to establish an equal protection violation. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Plaintiff has failed to identify anyone who was similarly situated who was treated differently. The allegations against plaintiff were serious, and Jordan thought they needed to be disposed of once and for all. If the allegations against plaintiff had been true and Jordan knew about them but failed to do something, serious consequences could have resulted.

■ Finally, the defendants did not violate plaintiff's right to due process. The threshold question in any due process analysis is whether a liberty interest is implicated. *Wildermuth v. Furlong*, 147 F.3d 1234, 1237 (10th Cir.1998). Plaintiff must first show that a liberty interest exists and then that the liberty interest was infringed upon. *Workman v. Jordan*, 32 F.3d 475, 480 (10th Cir.1994). The defendants took no adverse action against plaintiff as a result of the KBI investigation. Therefore, plaintiff has not raised any due process concerns.

Because the individual defendants did not violate plaintiff's constitutional rights, the individual defendants' motion is granted with respect to plaintiff's § 1983 claim, and the court need not address the issue of qualified immunity.[15]

**2. Claims Against the City of Liberal**

■ In *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court found that "Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies." *Id.* at 690, 98 S.Ct. 2018. "Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief." *Id.* (footnote omitted). In *Monell*, the Supreme Court found that a municipality

**15.** Plaintiff's claims against Marble in his official capacity are barred by the Eleventh Amendment. *See Hunt v. Bennett*, 17 F.3d 1263, 1267 (10th Cir.1994) (The Eleventh Amendment "precludes a federal court from assessing damages against state officials sued in their official capacities because such suits are in essence suits against the state.")

cannot be liable under § 1983 solely because it employs a tortfeasor, *i.e.*, a municipality cannot be held liable on a respondeat superior theory. *Id.* at 691, 98 S.Ct. 2018. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. 2018. Therefore, in order for the City of Liberal to be liable under § 1983, plaintiff "must show (1) the existence of a municipal custom or policy and (2) a direct causal link between the custom or policy and the violation alleged." *Jenkins v. Wood*, 81 F.3d 988, 993 (10th Cir.1996) (citing *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

Because the court has determined plaintiff suffered no deprivation of constitutional rights, it is unnecessary to determine whether the City had a custom or policy of racial discrimination. Therefore, the City is entitled to summary judgment on plaintiff's § 1983 claim.

## D. § 1985 Conspiracy

Plaintiff claims Maddox, Jordan, Carlile and Marble participated in a conspiracy to violate his constitutional rights in violation of 42 U.S.C. § 1985(3), which provides:

> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the

United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

 To succeed on his conspiracy claim, plaintiff must show "(1) the existence of a conspiracy (2) intended to deny [him] equal protection under the laws or equal privileges and immunities of the laws (3) resulting in an injury or deprivation of federally-protected rights, and (4) an overt act in furtherance of the object of the conspiracy." *Murray v. City of Sapulpa*, 45 F.3d 1417, 1423 (10th Cir.1995). Section 1985(3) "requires proof that a conspirator's action was motivated by a class-based, invidiously discriminatory animus." *Dixon v. City of Lawton*, 898 F.2d 1443, 1447 (10th Cir.1990). "Thus, section 1985(3) provides for redress of injuries which result from private conspiracies driven by 'some racial or otherwise class-based discriminatory animus.'" *Id.* (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)).

██ Plaintiff bases his conspiracy claim on a limited number of actions taken by the defendants, specifically, Carlile's opposition to plaintiff's appointment to the Committee, Maddox's and Jordan's alleged discussion regarding the consequences of plaintiff being found guilty of domestic violence, Maddox's alleged failure to inform either Jordan or Marble of Aumiller's mental state, Jordan's "vicious letter to the psychologist," and Marble's "false" and "slanted" reports regarding plaintiff.

Plaintiff's conspiracy claim fails in several respects. First, plaintiff has failed to show the existence of a conspiracy. None of the acts mentioned above show the concerted efforts of the defendants. Carlile voiced his opposition to plaintiff's appointment to the Committee to several individuals, including Jordan. Jordan informed Carlile that he would form his own opinions of police officers, which demonstrates

the two were not acting in concert. Jordan and Maddox allegedly discussed the consequences of plaintiff being found guilty of domestic violence; however, that conversation alone does not establish a conspiracy. Plaintiff further claims Maddox withheld information regarding Aumiller's mental state from Jordan and Marble. Whether he did so or not was an action he took on his own initiative; Jordan and Marble had no control over Maddox's mental state. Further, the "vicious" letter Jordan wrote to Dr. Allen set forth the allegations that had been made against plaintiff. Jordan did not claim the allegations had been substantiated. And, plaintiff does not claim any of the defendants assisted Jordan in writing the letter. Finally, Marble prepared his own reports. There is no evidence before the court that suggests any of the other defendants took part in writing the reports.

Second, plaintiff has not sustained any injuries resulting from the defendants' alleged actions. Third, plaintiff has suffered no deprivation of federally-protected rights. Finally, plaintiff has failed to show that the defendants' actions were motivated by a "class-based, invidiously discriminatory animus." *Dixon*, 898 F.2d at 1447.

### E. § 1986 Negligence

Plaintiff has brought a claim against Thornburg and the City pursuant to 42 U.S.C. § 1986, which provides:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented....

The derivative nature of a claim under § 1986 is "universally recognized." *Cain v. Archdiocese of Kan. City, Kan.,*

508 F.Supp. 1021, 1027 (D.Kan.1981). No claim exists under § 1986 unless there is a valid claim under § 1985. *Id.* Because plaintiff does not have a valid § 1985 claim, his § 1986 must also fail.

### F. Conclusion

For the reasons set forth above, the defendants' motions for summary judgment are granted with respect to plaintiff's § 1981 discrimination claim against all defendants; § 1983 claim against Maddox, Jordan, Carlile, Marble and the City; § 1985 conspiracy claim against Maddox, Jordan, Carlile and Marble; § 1986 negligence claim against Thornburg and the City; and his Title VII discrimination claim against the City. The City's motion for summary judgment is denied with respect to plaintiff's Title VII retaliation claim.

IT IS THEREFORE ORDERED THIS 28th day of May, 1999, that the defendants' motions to strike plaintiff's response are denied (dkt. nos. 114 and 115); Marble's motion for summary judgment (dkt. no. 107) is granted; and the other defendants' motion for summary judgment (dkt. no. 104) is granted in part and denied in part as set forth above.