**Dr. Cynthia ANNETT, PH.D. and Dr. Raymond Pierotti, PH.D., Plaintiffs,**

v.

**UNIVERSITY OF KANSAS, and Dr. Thomas Taylor, PH.D., in his personal capacity, Defendants.**

No. Civ.A. 99–2070–CM.

United States District Court, D. Kansas.

Jan. 26, 2000.

Alan V. Johnson, Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, KS, for Cynthia Annett, PH.D, plaintiff.

Rose A. Marino, Office of General Counsel, University of Kansas, Lawrence, KS, Barbara L. McCloud, University of Kansas, Office of the General Counsel, Lawrence, KS, for University of Kansas, defendant.

## MEMORANDUM AND ORDER

MURGUIA, District Judge.

This matter is before the court on defendants' motions for summary judgment against plaintiff Annett, (Doc. 39), and against plaintiff Pierotti. (Doc. 40). The court has also considered the motion by plaintiff Pierotti to supplement his memo-

randum in opposition to the defendants' motion. (Doc. 52). Dr. Pierotti's motion is granted. As explained fully below the defendants' motions are granted in part and denied in part.

## I. Plaintiff Pierotti's Motion to Supplement Memorandum in Opposition

Dr. Pierotti justifies his motion alleging the defendants have made arguments for the first time in their reply memorandum. The defendants argue that the motion is contrary to Fed.R.Civ.P. 56 and D.Kan. Rules 7.1 and 56.1 without specifying in what way the motion is violative of the rules. In both memoranda the parties argue the merits of the summary judgment motion.

Supplementation of motions is committed to the sound discretion of the court. *See* 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1194 (2d ed.1990). In the interest of justice Dr. Pierotti's motion to supplement his memorandum in opposition is granted so that the court may fully consider the parties' arguments on the summary judgment motion at issue. The court has considered the arguments in Dr. Pierotti's motion to supplement and the defendants' opposition in deciding the motion for summary judgment.

## II. Uncontroverted Facts

There is considerable controversy between the parties as to the facts in this case and, to a greater extent, the legal effect of the facts. As required for summary judgment purposes, the court views the facts in the light most favorable to the plaintiffs. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Ra-*

*dio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The court will provide additional facts when it addresses the summary judgment motion against Dr. Pierotti.

Plaintiffs are husband, Dr. Pierotti, and wife, Dr. Annett, who were employed by the University of Kansas (KU) as tenure–track assistant professors in the Department of Systematics and Ecology beginning in 1992. The Department of Systematics and Ecology was later merged with the Department of Botany to form the Department of Ecology and Evolutionary Biology. Merger of the departments is irrelevant to the issues in this case, and the Department of Systematics and Ecology or the Department of Ecology and Evolutionary Biology will be referred to hereinafter as the department. Dr. Thomas Taylor became chair of the departments in 1996 and remains in that position.

In January 1997, at a regular meeting of the department Dr. Taylor suggested that, in order to provide financial support to graduate students then in the department for a longer period of time, the department should reduce the number of graduate students admitted. Graduate students who are teaching assistants or research assistants, are employees of the university. Dr. Annett generally opposed changes which, in her opinion, would discriminate against minority, female and non-traditional students in the Master's program.[1]

Changes were approved at a special meeting of the department held on March 1, 1997. At the meeting Dr. Annett once again opposed several of the changes, alleging that they unfairly discriminated against minority and female students.[2] Subsequently, on March 7, 1997, Dr. Pierotti sent a letter to Dr. Taylor, protesting

---

**1.** The defendants controvert the evidentiary basis for this assertion, but the court notes that the minutes of the department meeting are admissible as business records of KU, and indicate Dr. Annett's general concern about discrimination. (Def.s' Reply to Annett at 4). Defendants controvert numerous of the plaintiffs' statements of fact throughout these

memoranda by opposing only certain portions of the statements. The court therefore, for the purpose of summary judgment, accepts the portions not controverted.

**2.** The defendants attempt to controvert this assertion, but attack only the deposition exhibit, not the testimony of the plaintiff.

the changes. Dr. Pierotti stated his opinion that the graduate committee of the department contained members who resisted efforts to recruit minorities, and that fact influenced the new policies. He opined that the changes would prevent recruitment of minority graduate students, that the department had historically failed to support minority recruitment of both students and faculty, and that by changing the program the department was becoming anti-minority.[3]

Dr. Pierotti sent a copy of the March 7 letter to the Dean of the college and to the Provost and Chancellor of the university. Dr. Taylor circulated the letter to the other department faculty. At least one other of the faculty felt that the letter should not have been sent to the Dean, the Provost and the Chancellor until an attempt was made to settle the matter within the department. On March 17, 1997, Dr. Taylor sent a response to Dr. Pierotti in which he expressed concern that Dr. Pierotti "chose to open a department discussion at the level of the Provost and Chancellor because you feel your opinion is the only valid one." A copy was sent to the Dean.

In the spring of 1995 Dr. O'Brien made a pre-tenure review of Dr. Annett, evaluating her outstanding in teaching, research and service. On April 18, 1997 Dr. Taylor notified Drs. Annett and Pierotti that they were scheduled for mandatory review for promotion and tenure (hereinafter promotion) during the 1997–98 academic year. Dr. Annett received her 1996 evaluation from Dr. Taylor in a letter and attachment dated April 22, 1997. The attachment indicated that Dr. Annett's standardized research evaluation score was higher than the department median in 1996 and in two out the three preceding years. The dollar amount of Dr. Annett's salary increase was greater than the department average in 1996 and in all three preceding years.[4]

In the summer of 1997, Dr. Taylor changed the department's promotion pro-

cedures. None of these major changes were discussed with the plaintiffs. Seven external referees were contacted to review Dr. Annett's packet. Four recommended promotion, two did not. The seventh noted that Dr. Annett's packet would proceed with some difficulty at his school.

The department Promotion and Tenure Committee recommended Dr. Pierotti for promotion but did not recommend Dr. Annett. On October 22, 1997, a majority of the faculty of the department agreed with the recommendation. Dr. Taylor, as chair of the department, did not recommend Dr. Annett for promotion.

On November 3, 1997, during the promotion process, Dr. Taylor requested that the Dean investigate whether Dr. Annett had violated the Faculty Code of Conduct by listing three works in her promotion packet as "accepted for publication or in press." The Associate Dean was assigned to do the investigation. The College Committee on Promotion and Tenure, on December 16, 1997, voted to recommend Dr. Pierotti, but not Dr. Annett for promotion. The negative vote on Dr. Annett was based upon a poor rating in research and scholarship.

In February 1998, the University Committee on Promotion and Tenure began its consideration of Drs. Annett and Pierotti for promotion. The University Committee requested additional information from the Department Committee and the College Committee. On February 18, 1998, Dr. O'Brien provided a letter to the University Committee urging a recommendation for promotion of Dr. Annett. In March, 1998, the University Committee recommended both Drs. Annett and Pierotti for promotion. The Provost disagreed with the recommendation of the University Committee and recommended to the Chancellor that Dr. Annett not be granted promotion. The Chancellor followed the recommendations of the Provost and granted promotion to Dr. Pierotti but not Dr. Annett.

---

**3.** The defendants controvert the truth of the assertions, but not the fact that the assertions were made.

**4.** Although the defendants controvert these facts, the record cited by Dr. Annett is clear,

and the court could find neither Depo.Ex. 5 nor Taylor Depo.Pg. 195 at Ex. 35 cited by the defendants to controvert the facts asserted.

## III. Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences. therefrom in the light most favorable to the nonmoving party. *Adler,* 144 F.3d at 670 (citing *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.)

The moving party bears the initial burden of demonstrating an absence of a general issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71, 106 S.Ct. 2505. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *see Adler,* 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. "Conclusory statements going to ultimate issues are not adequate to avoid summary judgment." *Koch v. Koch Indus., Inc.,* 969 F.Supp. 1460, 1471 (D.Kan.1997). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## IV. *McDonnell Douglas* Framework

The Supreme Court has established a three-step burden shifting format for the analysis of various claims under Title VII of the Civil Rights Act, and 42 U.S.C. § 1981. *McDonnell Douglas v. Green* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Claims of sex or race discrimination based upon disparate treatment and claims of retaliation for engaging in protected activity are all analyzed under the *McDonnell Douglas* framework. *See, e.g., Randle v. City of Aurora,* 69 F.3d 441, 450 (10th Cir.1995) (discrimination claims under Title VII and § 1981); *Medlock v. Ortho Biotech, Inc.,* 164 F.3d 545, 549–50 (10th Cir.1999) (retaliation claim under Title VII); *Austin v. Haaker,* No. CIV.A .98–2283–GTV, 1999 WL 1144792, at *4 (D.Kan. Nov.24, 1999) (retaliation claim under § 1981).

The plaintiff has the initial burden to establish a prima facie case of discrimination or retaliation. At a minimum, the plaintiff must produce evidence that raises a reasonable inference that each element exists. *See Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 529 (10th Cir. 1994). If the plaintiff produces evidence which could establish a prima facie case, the burden of production shifts to the defendant to articulate a facially nondiscriminatory reason for its actions. If the defendant meets its burden, the plaintiff will prevent summary judgment only by producing direct evidence of discrimination or retaliation, or by producing evidence that the defendant's proffered nondiscriminatory reason is pretextual—unworthy of be-

lief. *See McDonnell Douglas*, 411 U.S. at 801–805, 93 S.Ct. at 1824–25; *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981); *Elmore v. Capstan, Inc.*, 58 F.3d 525, 529–30 (10th Cir.1995); *Cone*, 14 F.3d at 529.

### V. Analysis Under *McDonnell Douglas*

Dr. Pierotti argues that his claims constitute "a 'direct evidence' case, not a 'pretext' case." (Pl. Pierotti's Mem. in Opp'n at 16). The court will address the law applicable to 'direct evidence' claims later sex discrimination in promotion Dr. Annett and will analyze Dr. Pierotti's claims at that time. We first address the claims of Dr. Annett.

### A. Dr. Annett's Sex Discrimination Claims

 To establish a prima facie case of must show that (1) she is a member of a protected class, (2) she applied for and was qualified for promotion and tenure, (3) she was rejected, and (4) the position remained open while the university continued to seek to fill the position. *City of Aurora*, 69 F.3d at 451 n. 13. Dr. Annett is a woman, a member of the protected class. She has provided evidence that at least four referees recommended her for promotion and tenure and that she had been evaluated above average in the department. That is **evidence** she is qualified.[5] All parties agree she was rejected for the position. KU does not argue that the position ceased to exist. Dr. Annett has produced evidence of all four elements of a prima facie case.

 Dr. Annett admits that KU has met its burden in the second stage of analysis by proffering nondiscriminatory reasons for its refusal to grant promotion. (Pl. Annett's Mem. in Opp'n at 29). She argues that she has produced evidence that KU's reasons are pretextual. The defendants argue that Dr. Annett has failed to

provide evidence of discriminatory motivation. However, pretext may also be established by inference from circumstantial evidence. *See Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1509, 1511 (10th Cir.1997).

Dr. Annett produced testimony by Dr. Carlson that the Provost had confidential information which he would not share with the University Committee. The defendants argue that there is "no **other** evidence to support plaintiff's contention." (Def.s' Reply Mem. to Pl. Annett at 33) (emphasis added). At the summary judgment stage, the court may not weigh the evidence, but must determine if the non-movant has produced credible evidence which establishes a dispute about a material fact. As Dr. Annett argues, the mere fact that the Provost had information he was unwilling to share with the committee is evidence which, if believed by the jury, could raise an inference of discrimination or retaliation.

Dr. Carlson stated her opinion that Dr. Taylor put together a promotion and tenure file on Dr. Annett which was "not friendly." Dr. Carlson testified that she considered the possibility the file was unfriendly because Dr. Annett was a woman. There is evidence Dr. Holt was asked to recuse himself from the College Committee's deliberations without precedent for such action. A jury could, based upon this circumstantial evidence, determine that KU's reasons are after-the-fact justifications or pretext, and not worthy of credence.

The court finds a genuine issue of material fact whether KU's stated nondiscriminatory reasons were pretext. Therefore summary judgment is not proper on Dr. Annett's claims of sex discrimination based upon disparate treatment.

### B. Dr. Annett's Retaliation Claims

 To establish a prima facie case of retaliation a plaintiff must show that (1)

---

5. Defendants argue the court should not substitute its judgment on the plaintiff's qualifications. However, the plaintiff must produce evidence of a prima facie case which a rational jury could believe. Where, as here, the plaintiff has also shown evidence that the defendants' reasons are pretext, the court must allow the jury to decide the question of pretext. *Cf. Cone*, 14 F.3d at 529 (summary judgment proper where there is no evidence of pretext).

she engaged in protected opposition to unlawful employment practices, (discrimination), (2) the employer took employment action adverse to the employee, and (3) there was a causal connection between the protected activity and the adverse action. *Jeffries v. State*, 147 F.3d 1220, 1231 (10th Cir.1998). The elements of a prima facie case are the same under § 1981 and Title VII. *See Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1103, n. 1 (10th Cir. 1998).

The defendants admit that allegations of academic misconduct and refusal to grant promotion constitute adverse employment action. (Def.s' Mot. against Annett at 27). They argue that Dr. Annett cannot establish the first and third elements of her case. First they argue that Dr. Annett's opposition to graduate program policies is not protected opposition to **employment** practices because the policies affect graduate students, not **employees** of the university. The defendants do not controvert that the policy changes were for the purpose of "provid[ing] financial support to [graduate] students currently in the department for a longer time." (Pl. Annett's Mem. in Opp'n at 6–7). Defendants accept that graduate students who are research assistants or teaching assistants are employees of the university. (*Id.*). Because the policy changes came up in the context of providing financial support to graduate students, and because an assistantship is a form of financial support to a graduate student, the court finds a genuine issue of material fact whether the changes in policies at issue constitute unlawful employment practices. The court assumes for summary judgment purposes that Dr. Annett has met the first element—protected opposition.

The defendants finally argue that Dr. Annett cannot establish the third element—a causal connection between the proposals of Dr. Taylor and the adverse action plaintiff suffered. (Def.s' Mot. against Annett at 29–30). This argument is unclear to the court. The law requires that Dr. Annett establish a causal connec-

tion between the protected activity and the adverse employment action. In this case, the connection must be established between Dr. Annett's opposition to the allegedly discriminatory policies and the filing of academic misconduct charges and the refusal to grant promotion.

Dr. Taylor suggested the department change its policies on financial support of graduate students. "[T]he proposed changes to the graduate program were passed." [6] (Pl. Annett's Opp'n at 7). Whether Dr. Taylor was the author of each of the changes that was eventually passed is not determinative of whether he personally retaliated against Dr. Annett for her opposition to the changes. Dr. Taylor could retaliate against Dr. Annett for opposing changes supported by the department which he chaired even if he were not the author of the changes.

Close temporal proximity between protected opposition and the adverse employment action is necessary to infer a causal connection under the *McDonnell Douglas* framework. *See Williams v. Columbia/HCA Healthcare Corp.*, No. 98–2084–JTM, 1999 WL 592674, at *4 (D.Kan. July 30, 1999) (*citing Candelaria v. EG & G Energy Measurements, Inc.*, 33 F.3d 1259, 1262 (10th Cir.1994)). The defendants point out that the decision to refuse promotion and the allegations of academic misconduct did not occur until six months or more after the protected activities alleged by Dr. Annett. The promotion process **began** within two months after the protected activities. It is reasonable to believe that an intent to discriminate or retaliate formed at the beginning of the process could continue and produce retaliatory results later in the process. Because the promotion and tenure process began within two months after the plaintiff's opposition to allegedly discriminatory employment practices, the court finds that Dr. Annett has provided evidence from which a jury could find a causal connection between the protected activity and the ad-

---

6. The defendants controvert the allegation that Dr. Annett expressed opposition to the changes, but admit that changes were passed.

(Def.s' Reply to Annett at 4–5). *Cf.* (Pl. Annett's Opp'n at 7).

verse employment actions. Dr. Annett has established a prima facie case of retaliation.

The legitimate nondiscriminatory reasons the defendants offer on the plaintiff's discrimination claim also apply to the retaliation claim. Therefore the plaintiff must provide evidence that the legitimate nondiscriminatory reasons are a pretext, unworthy of belief.

As the court stated in its analysis of the plaintiff's discrimination claim, the evidence which the plaintiff has provided in support of a finding of discriminatory intent, if believed by the jury would also support a finding of retaliatory intent. Therefore the court finds a genuine issue of material fact whether KU's stated nondiscriminatory reasons were a pretext. Summary judgment is not proper on Dr. Annett's claims of retaliation.

## VI. Dr. Pierotti's Claims

### A. Additional Uncontroverted Facts

Dr. Pierotti testified that his maternal grandmother was full-blooded Native American. Dr. Pierotti is perceived at KU as a Native American faculty member, and is referenced in KU publications as a Native American faculty member.

Dr. Pierotti attended the January, 1997 department meeting at which Dr. Taylor suggested changes to the graduate education program. Dr. Pierotti was unable to attend the March 1, 1997 meeting at which the department approved the proposed changes to the program. On March 7, 1997, Dr. Pierotti sent Dr. Taylor the protest letter mentioned earlier.

On April 20, 1998 Dr. Pierotti filed a formal complaint with the KU Office of Equal Opportunity, charging that Dr. Taylor and the Dean of the College of Liberal Arts and Sciences had discriminated and retaliated against him.[7] (Pl. Pierotti's Opp'n, App., Depo.Ex. 54). The unlawful acts alleged by Dr. Pierotti are: (1) chang-

ing the department's promotion and tenure procedures; (2) appropriating his office and laboratory space; (3) removing him as chair of the department's Minority Affairs Committee; and, (4) refusing to make a comparable counteroffer to his job offer from the University of Minnesota.

On October 22, 1998 Dr. Pierotti filed another formal complaint with the KU Office of Equal Opportunity.[8] (Pl. Pierotti's Mem. in Opp'n, App., Depo.Ex. 258). The complaint alleges the following additional discriminatory and retaliatory actions occurring after Dr. Pierotti filed his first complaint: (5) appropriating additional office and laboratory space; (6) failing to support his national award; (7) interfering with his recruitment and mentoring activities; (8) assigning him additional teaching responsibilities; and, (9) refusing to approve his appointment in the Indigenous Nations Studies Program.

On January 21, 1998, Dr. Taylor sent a memo asking Dr. Pierotti to vacate room 6028 by January 26, 1998. At some time thereafter Dr. Pierotti met with the Provost to discuss Dr. Taylor's alleged discriminatory conduct. His allegations are contained in a letter to the Provost dated January 26, 1998. Late in the afternoon of January 26, 1998, Dr. Taylor sent an e-mail to Dr. Pierotti requesting an immediate meeting to discuss the space issue, and 'disturbing' statements attributed to Dr. Pierotti.

Dr. Pierotti sent a letter to the Assistant Provost on February 9, 1998 complaining that Dr. Taylor had appropriated room 6028 from Dr. Pierotti's use while Dr. Pierotti was out of town. The letter indicated **Dr. Pierotti's belief** that the actions were taken by Dr. Taylor in retaliation for Dr. Pierotti's criticism of Dr. Taylor "for being insufficiently sensitive to the needs of minority and female students and facul-

---

7. The court accepts that the allegations were made, but notes that it may not accept as fact any acts alleged in the complaint because plaintiff does not support the allegations by admissible sworn testimony.

8. As noted above, the court accepts that the allegations were made, but notes that it may not accept as fact any acts alleged in the complaint because plaintiff does not support the allegations by admissible sworn testimony.

ty." (Pl. Pierotti's Mem. in Opp'n at 7); *cf.* (Def.s' Reply to Pierotti at 10).[9]

Dr. Pierotti met with the Dean on February 25, 1998 to discuss an offer of employment as a tenured associate professor with the University of Minnesota. The offer was confirmed in a letter in early March 1998. Minnesota offered a salary of $52,000 a year, two months summer salary for the first three years, approximately 28% additional in benefits and $30,000 'start-up' funding for a research program. The Dean sought input from Dr. Taylor whether the department would support a counteroffer.

The department had made a counteroffer to a white untenured faculty member, Dr. Gomulkiewicz, in response to an offer from Washington State University. KU probably matched the offer from Washington State University.[10]

The executive committee unanimously decided to recommend that the offer not be countered. In an April 1, 1998, letter to the Dean relaying this information, Dr. Taylor noted that he and the acting director of the Environmental Studies Program concurred with the recommendation of the executive committee. Dr. Taylor commented:

> [Dr. Pierotti's] lack of collegiality, confrontational manner, disregard for the opinions of others, and lack of appreciation for the democratic process have far outweighed his contributions in teaching, service and research. His criticism of colleagues and erroneous claims relating to Department, College and University

regulations and procedures make him very difficult to deal with in a system that relies on sensitivity, citizenship, and collegiality. My assessment and that of the Executive Committee is that the remainder of Dr. Pierotti's career would be best served at another institution.

(Pl. Pierotti's Mem. in Opp'n, App., Depo. Ex. 52).

The Dean's April 2, 1998, response to Dr. Pierotti concerning the Minnesota offer was that he could expect a merit increase and promotion bonus but that no additional contribution would be made. The letter noted concerns that:

> the "lack of collegiality, confrontational manner, disregard for the opinions of others, and lack of appreciation for the democratic process" expressed by you [Dr. Pierotti] in recent months calls into question any long term commitment you might have to your colleagues, the department, and the university.

(Pl. Pierotti's Mem. in Opp'n, App., Depo. Ex. 53).

In November of 1998, Dr. Pierotti was seeking a fellowship to work with the Indigenous Nations Studies Program at KU. On November 6, 1998, Dr. Taylor wrote a letter addressed to the Provost.[11] In the letter, Dr. Taylor stated:

> As you are aware, Dr. Pierotti has a long history of having a difficult time interacting with faculty colleagues on this campus. He speaks enthusiastically about his involvement with Haskell Indian Nations University, yet I am aware of numerous instances in which he has

9. As defendants argue, Dr. Pierotti does not support his allegations with admissible sworn testimony. Therefore the court accepts the statements only as they indicate Dr. Pierotti's opinion and that the allegations were made.

10. The defendants argue the Dean testified she did not recall whether the university matched the offer. Her testimony was that she didn't "recall what the offer was." However, she went on to say that the university "probably did" match the offer. (Def.s' Reply to Pierotti, Ex. 64, Frost Mason Depo., at 198, ll. 11–18). The defendants' argument goes to the weight and credibility of the testimony, not to whether it constitutes evidence that KU matched the offer.

11. The defendants controvert that the letter was ever signed or sent. They do not deny that the letter was **written** by Dr. Taylor. The defendants argue in vague terms that the letter was not included as a claimed adverse action in the pretrial order, and that it does not present a material fact to any incident of discrimination or retaliation. (Def.s' Reply to Pierotti at 12–13). The court finds that the letter is material—whether it was actually sent or not—as evidence which might tend to indicate Dr. Taylor's motives relating to the questions of discrimination or retaliation. The defendants do not deny that Dr. Taylor's personal motives as a decision maker may be attributed to the University.

offended faculty both on this campus and at Haskell by his less-than-collegial activities. He has filed grievances within the University regarding discrimination which have subsequently been turned down and also has a case pending with the Kansas Human Rights Commission. Dr. Pierotti has an agenda that in my opinion is not in the best interests of either the students or faculty at the University of Kansas and Haskell Indian Nations University. He lacks the poise, tact, and ability to dialogue on issues; if a faculty member disagrees with him, s/he is branded as discriminatory. His comments and interactions with many colleagues in this department have reflected poorly on Pierotti having any ability to effectively interact for the best interests of this university.

(Pl. Pierotti's Mem. in Opp'n, App., Depo. Ex. 255).

## B. Direct Evidence Framework

Dr. Pierotti rejects application of the *McDonnell Douglas* framework to his claims. He argues "the instant case is a 'direct evidence' case, not a 'pretext' case." (Pl. Pierotti's Mem. in Opp'n at 16). The law in the Tenth Circuit is that a plaintiff may present direct evidence of discriminatory or retaliatory intent **or** use the *McDonnell Douglas* burden-shifting framework. *See Denny's, Inc.*, 111 F.3d at 1509; *Miller v. Maddox*, 51 F.Supp.2d 1176, 1188, 1191 (D.Kan.1999) (discrimination and retaliation claims treated the same under direct evidence analysis); *see also, Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 549–50 (10th Cir.1999). Where the plaintiff fails to provide direct evidence of discriminatory or retaliatory intent, the court will use the *McDonnell Douglas* framework. *See Maddox*, 51 F.Supp.2d at 1188, 1191.

■■ To prevail in a direct evidence case "a plaintiff must introduce direct or circumstantial evidence that the alleged [discriminatory or] retaliatory motive 'actually relate[s] to the question of discrimination in the **particular employment decision,** not to the mere existence of other,

potentially unrelated forms of discrimination in the workplace.'" *Medlock,* 164 F.3d at 550 (emphasis added) (*quoting Thomas v. National Football League Players Ass'n,* 131 F.3d 198, 204 (D.C.Cir.1997)); *see also Maddox,* 51 F.Supp.2d at 1188. The plaintiff may prove discriminatory or retaliatory motive by evidence of statements or conduct by decision makers that may be viewed as reflecting the motive. *See Denny's,* 111 F.3d at 1512. Finally, the remarks or conduct used as evidence of discriminatory or retaliatory motive must relate to the **particular employment decision at issue.** *See Medlock,* 164 F.3d at 550; *Cianci v. Pettibone Corp.,* 152 F.3d 723, 727 (7th Cir.1998); *Rivers–Frison v. Southeast Missouri Community Treatment Ctr.,* 133 F.3d 616, 619 (8th Cir.1998); *Smith v. DataCard Corp.,* 9 F.Supp.2d 1067, 1079 (D.Minn.1998).

### 1. Direct Evidence of Retaliation Against Dr. Pierotti

■ Dr. Pierotti points to the written statements of April and November, 1998 by Dr. Taylor and the Dean as direct evidence of retaliatory or discriminatory animus which would preclude summary judgment of his claims. Title VII does not prohibit retaliation for any reason, it prohibits discrimination (retaliation) for opposition to any practice made an unlawful employment practice under Title VII. *See* 42 U.S.C. § 2000e–3; *Maddox,* 51 F.Supp.2d at 1191. Even if the activity opposed is determined not to be an unlawful employment practice, a meritorious retaliation claim will stand. *See, Sanchez v. Denver Pub. Sch.,* 164 F.3d 527, 533 (10th Cir.1998) (*citing Jeffries v. Kan.,* 147 F.3d 1220, 1231 (10th Cir.1998)). The plaintiff must only show that he held a good faith, reasonable belief that the practice was unlawful, and that he opposed the practice. *See, Evans v. Kansas City, Mo. Sch. Dist.,* 65 F.3d 98, 100 (8th Cir.1995).

Dr. Pierotti does not specify which activities he believes constitute opposition to unlawful employment practices. In light of this court's decision that the March 1997 changes in the graduate education pro-

gram could be viewed as an unlawful employment practice under Title VII, Dr. Pierotti's March 7, 1997 letter constitutes opposition to that practice. Dr. Pierotti's January 1998, letter to, and meeting with the Provost, and his February 1998 letter to the Assistant Provost could constitute opposition to unlawful employment practices—discriminating or retaliating against Dr. Pierotti. Filing discrimination complaints with the Kansas Human Rights Commission and with the Office of Equal Opportunity in April and October 1998, constitute opposition to unlawful employment practices. The court must, therefore, determine whether the evidence adduced by Dr. Pierotti constitutes direct evidence of intent to retaliate because of opposition to an unlawful employment practice.

The written statements referred to by Dr. Pierotti show a retaliatory intent. What the court must decide is whether they indicate an intent to retaliate for some act of Dr. Pierotti taken in opposition to an unlawful employment practice. The court infers from Dr. Taylor's April 1, 1998 letter recommending no counteroffer that the refusal to recommend is at least in part because of Dr. Pierotti's "erroneous claims relating to Department ... regulations and procedures." Dr. Pierotti's claims before the Office of Equal Opportunity and the Kansas Human Resource Commission were not filed until after Dr. Taylor's letter. But, the statement in the letter can be viewed as referring to Dr. Pierotti's March 7, 1997 letter alleging discriminatory department policies,[12] Dr. Pierotti's criticism of Dr. Taylor's alleged insensitivity to female and minority employees, and Dr. Pierotti's complaints to the Provost and Assistant Provost in January and February, 1998. The same analysis applies to the Dean's April 2, 1998, letter to Dr. Pierotti. The statements are logically connected to allegedly protected activities and constitute direct evidence of retaliatory intent.

Dr. Taylor's letter of November 6, 1998 provides an even more clear inference of retaliatory intent. The letter states that Dr. Pierotti "has filed grievances within the University regarding discrimination ... and also has a case pending with the Kansas Human Rights Commission. Dr. Pierotti has an agenda that in my opinion is not in the best interests of ... the University of Kansas.... [I]f a faculty member disagrees with him, s/he is branded as discriminatory." The structure of the paragraph would lead one to believe that Dr. Taylor's opinion, at least in part, is based upon Dr. Pierotti's actions in filing grievances within the University and filing with the Kansas Human Rights Commission. Title VII prohibits basing employment decisions upon such protected activities. The statement is logically connected to protected activities. Dr. Pierotti has produced direct evidence of retaliatory intent.

██ However, in a direct evidence case the motive must actually relate to the particular employment decision at issue, not merely to other unrelated forms of retaliation. See, e.g., Medlock, 164 F.3d at 550; Maddox, 51 F.Supp.2d at 1188. The written statements used by Dr. Pierotti to show retaliatory intent relate only to the decision not to counter the terms of the Minnesota offer, and the decision not to approve his transfer to the Indigenous Nations Studies Program. Dr. Pierotti points to no direct evidence of retaliatory intent which relates to any other employment decision. Therefore the defendants' motion for summary judgment must be denied as to Dr. Pierotti's retaliation claims **only** as they relate to the particular employment decisions at issue in the statements—the decision not to counter the terms of the Minnesota offer, and the decision not to approve Dr. Pierotti's transfer to the Indigenous Nations Studies Pro-

---

12. No party has briefed nor argued the issue of temporal proximity in a direct evidence case. There is evidence that the Dean and Dr. Taylor viewed the remarks as referring to the March, 1997 letter. (Taylor Depo., Aug. 27, 1999 at 148–51; Frost–Mason Depo at 99–100). Therefore, and because Dr. Pierotti alleges a continuing pattern of retaliation, the court finds evidence of a causal connection despite lapse of a year between the incidents.

gram. All other claims of retaliation by Dr. Pierotti are dismissed.

### 2. Direct Evidence of Race Discrimination Against Dr. Pierotti

The court finds no basis, however, to ascribe a **discriminatory** animus to the statements at issue. Title VII does not prohibit discrimination for any reason, it prohibits discrimination "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2.

■ None of the statements at issue contains **any** reference to the protected classifications. Mention of the name "Haskell Indian Nations University" cannot be viewed as a reference to protected classifications for the purposes of Title VII. KU may discriminate against an employee for "criticism of colleagues," "erroneous claims," "lack of collegiality, confrontational manner, disregard for the opinions of other, . . . lack of appreciation for the democratic process," "difficult time interacting with faculty colleagues," and lacking the "poise, tact and ability to dialogue on issues." In the context of race discrimination allegations, such remarks might be used to infer that an employer's proffered nondiscriminatory reasons were pretextual. In the context of a **direct evidence** case where the *McDonnell Douglas* burden-shifting framework is **not** used, pretext is not an issue. The remarks quoted above do not relate to discrimination because of race or other protected status. They are not direct evidence of race discrimination.

Dr. Taylor's November 1998 letter contains the only statement which refers to discrimination in the sense used in Title VII. That letter refers to "grievances within the University regarding discrimination" and "a case pending with the Kansas Human Rights Commission." Those statements refer to Dr. Pierotti's claims of discrimination against Dr. Taylor and KU, filed in April and October 1998. The statements reflect a **retaliatory** intent. They refer to filing of the grievances and the Kansas Human Rights Commission

case as factors, and potential bases for the particular employment decision at issue—not recommending that Dr. Pierotti be transferred to the Indigenous Nations Studies Program. But, the statements do not refer to Dr. Pierotti's **race** as a factor in the particular employment decision at issue, and they do not imply race was the basis of the decision at issue. Therefore, they cannot be viewed as evidence of statements by Dr. Taylor that betray an intent to discriminate on the basis of **race.**

The court finds that Dr. Pierotti has presented no direct evidence of **discriminatory** intent by KU or its decision makers to justify a direct evidence case of race discrimination. The court now must apply the *McDonnell Douglas* framework to determine whether Dr. Pierotti has established a prima facie case of discrimination.

### C. Race Discrimination Against Dr. Pierotti Under the McDonnell Douglas Framework

To state a prima facie case of discrimination, Dr. Pierotti must show: (1) he is a member of a racial minority; (2) he suffered an adverse employment action; and (3) similarly situated employees were treated differently. *See Trujillo v. University of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1215 (10th Cir.1998).

### 1. Member of a Racial Minority

Dr. Pierotti testified that his maternal grandmother was full-blooded Native American. He is referenced in University publications as a Native American faculty member. The defendants argue that Dr. Pierotti "has no evidence of his being a Native American." (Def.s' Mot. against Pierotti at 7). Their argument is based upon the allegation that Dr. Pierotti is not an enrolled member of the Comanche Nation, and that he has no sworn testimony from someone other than himself that he is Native American. Defendants' argument misses the point. Dr. Pierotti must produce **admissible evidence,** not conclusive proof, that he is a member of a protected

classification in order to establish a prima facie case. An individual's testimony as to his personal or family history concerning ancestry and relationship by blood or "other similar fact of his personal or family history" is admissible as an exception to the hearsay rule. Fed.R.Evid. 803(19). Perhaps such testimony will not be believed by the jury, but it is sufficient evidence to preclude summary judgment for failing to establish membership in a racial minority.

#### 2. Other Elements of a Prima Facie Case

■ In order to meet the second and third elements of a prima facie case, Dr. Pierotti must provide admissible evidence that he suffered adverse employment action, and that similarly situated employees were treated differently. Adverse employment action is liberally defined in this circuit. *See Sanchez v. Denver Pub. Sch.,* 164 F.3d 527, 532 (10th Cir.1998); *Jeffries,* 147 F.3d at 1232; *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 986 (10th Cir.1996); *Miller v. Maddox,* 51 F.Supp.2d 1176, 1189 (D.Kan.1999). Losses in the form of promotions, wages and benefits are not the sole determinant of adverse employment action. The Tenth Circuit takes a 'case-by-case' approach by looking at all of the factors in each case to determine if there is adverse employment action. Mere inconvenience or changing job responsibilities does not constitute adverse employment action. *See Sanchez,* 164 F.3d at 532; *Jeffries,* 147 F.3d at 1232; *Maddox,* 51 F.Supp.2d at 1189. "An employer's words or decision is not an adverse employment action just because the employee dislikes it or disagrees with it." *Fortner v. Kan.,* 934 F.Supp. 1252, 1267 (D.Kan.1996).

In considering whether similarly situated employees were treated differently, a court will look at employees who work with the same supervisor and are subject to the same standards governing discipline and performance evaluation. The court will look at work history, company policies and other relevant employment circumstances applicable to the plaintiff and the other employees alleged to be similarly situated to make its determination. *See Aramburu v. Boeing Co.,* 112 F.3d 1398, 1404 (10th Cir.1997).

#### 3. Case–by–Case Analysis

Dr. Pierotti bases his discrimination complaint upon nine alleged incidents of adverse employment actions. Dr. Pierotti chose to pursue this case as a direct evidence case and has not directed the court's attention to evidence in the record which would support his allegations. The court has done an independent search of the record to find admissible evidence which would provide an evidentiary basis for the allegations. Because Dr. Pierotti did not provide the court with complete copies of the relevant depositions, the court's search was necessarily limited. The plaintiff may not simply rest on his pleadings, but must provide admissible evidence from which a rational jury could find in his favor. *See Adler,* 144 F.3d at 671.

##### a. Changing the Department's Promotion and Tenure Procedures.

■ Dr. Taylor made several changes in the department's promotion and tenure procedures shortly before Dr. Pierotti was considered for promotion and tenure. However, Dr. Pierotti cannot demonstrate that the changes were an adverse employment action because he was promoted under the procedures as changed, and because he was supported by Dr. Taylor and KU at every level of the process.

Dr. Pierotti failed to provide evidence that similarly situated employees were treated differently. Dr. Pierotti does not allege that employees considered with him were treated differently than he. Employees considered for promotion and tenure in years before or after him would not be similarly situated because of the different needs of the university, different procedures for the process, and other factors unique to each situation. If Dr. Pierotti had alleged that after he was considered the procedures were changed back to

those used previously, the court might infer the procedures were changed for a discriminatory purpose. Absent that, or other evidence of disparate treatment, the court finds that Dr. Pierotti has not provided admissible evidence that similarly situated employees were treated differently. This incident does not establish a prima facie case of discrimination.

### b. Appropriating his Office Space in Early 1998

It is an employer's prerogative to assign its employees such office space as is necessary to do the job. Normally moving an employee from one space to another is not an adverse employment action. The admissible evidence presented shows only that Dr. Pierotti did not vacate a room after several notices, and that his material was moved from that room to another room while he was out of town.

Dr. Pierotti alleges that the room housed three of Dr. Pierotti's students. Such an allegation, if true, would tend to show harm to Dr. Pierotti's standing or reputation among his students and would likely constitute adverse employment action. However, in this case Dr. Pierotti has presented no admissible evidence of the alleged facts. The allegations are contained in deposition exhibit 243 and are cited in Dr. Pierotti's statement of fact # 17. The deposition exhibit will be admissible as a business record to show that the correspondence occurred and to show the allegations were made. As to the truth of the allegations asserted in the document, the exhibit is inadmissible hearsay. Fed.R.Evid. 801. Because the court can find no affidavit, deposition or other admissible evidence of the alleged facts, it must find that Dr. Pierotti has not met his burden to establish appropriation of the room as an adverse employment action.

Dr. Pierotti has failed to produce admissible evidence that a similarly situated employee was treated differently. This incident does not establish a prima facie case of discrimination.

### c. Removing Dr. Pierotti as Chair of the Department Minority Affairs Committee

A change of job responsibilities is not always viewed as an adverse employment action. The defendants argue that this was not an important committee, and removal as its chair is a minor change in working conditions. The court recognizes that removal from the chair of a committee in a university setting would be viewed as a 'demotion' by fellow faculty and students who heard of the removal. It would affect the reputation of the faculty member in the university community, it would affect his job responsibilities, and could affect his subsequent evaluations. Although Dr. Pierotti has not directed the court's attention to evidence which might establish the facts, the court tends to view this incident as an adverse employment action.

However, once again Dr. Pierotti has not produced, nor has the court discovered any admissible evidence which would indicate that similarly situated employees were treated differently. This incident does not establish a prima facie case of discrimination.

### d. Refusing to Make a Comparable Counteroffer

Dr. Pierotti does not show in what way this could be an adverse employment action. Although the refusal would not increase his pay or benefits if he remained at KU, the defendants could not reduce the offer made by Minnesota, and did not change the terms or conditions of his employment at KU by this action.

In this instance, Dr. Pierotti provides evidence that KU 'probably' matched an offer made to another faculty member earlier. The court notes that the other faculty member was untenured. Dr. Pierotti does not compare the circumstances of his situation to those of the other faculty member. However, because the court finds that the refusal was not an adverse employment action, it need not determine whether the other faculty member was

similarly situated. This incident does not establish a prima facie case of discrimination.

#### e. Appropriating Additional Office and Laboratory Space

The court relies upon its analysis in VI.C.3.b. above. Additionally, in this instance Dr. Pierotti has not alleged that students were affected by the appropriation. This incident does not establish a prima facie case of discrimination.

#### f. Failing to Support Dr. Pierotti's National Award

Although it is very unclear from the parties' memoranda, the essence of this allegation appears to be that the defendants did not appropriately recognize that Dr. Pierotti had been given a national award nor provide funding for him to attend a national meeting to receive the award. The society presenting the award seems to have paid the expenses of the trip. In any case, the court can imagine no way in which such a failure would amount to an adverse employment action short of evidence showing that the defendants had an unfailing practice of funding such trips. Dr. Pierotti produced no admissible evidence of such a practice.

Dr. Pierotti failed to produce admissible evidence that any similarly situated employee was treated differently. This incident does not establish a prima facie case of discrimination.

#### g. Interfering with Recruiting and Mentoring Activities

Dr. Pierotti produced no admissible evidence whatsoever of activity which could be construed to constitute interference with recruiting and mentoring activities. A party may not merely rely upon his pleadings without providing some evidence admissible at trial that such events occurred. Without evidence that such activities occurred, the court finds that Dr. Pierotti has failed to show evidence of adverse employment activity here.

Dr. Pierotti failed to produce admissible evidence that any similarly situated employee was treated differently. This incident does not establish a prima facie case of discrimination.

#### h. Assigning Additional Teaching Responsibilities to Dr. Pierotti

Such activities could constitute adverse employment action only in a case where the employer assigned teaching responsibilities in excess of what would be considered to be within the normal range for professors in the position of Dr. Pierotti. Dr. Pierotti does not produce such evidence. Dr. Pierotti has not met his burden to provide evidence that the assignments made were adverse employment actions.

Dr. Pierotti failed to produce admissible evidence that any similarly situated employee was treated differently. This incident does not establish a prima facie case of discrimination.

#### i. Refusing to Approve Transfer of Dr. Pierotti's Appointment to the Indigenous Nations Studies Program.

This action could be viewed as an adverse employment action only if Dr. Pierotti showed there is increased responsibility, pay, or prestige in the new program, showed an unfailing practice by the university to approve such requests, or showed that the decision was arbitrary or capricious. Dr. Pierotti presents no evidence suggesting this action is an adverse employment action except that he was seeking a fellowship to work with the Indigenous Nations Studies Program. Dr. Pierotti failed to produce admissible evidence that any similarly situated employee was treated differently. This incident does not establish a prima facie case of discrimination.

Dr. Pierotti has failed to establish a prima facie case of discrimination as to any of the actions of the defendants which he alleges constitute discriminatory conduct. Because Dr. Pierotti has failed to establish

a case of race discrimination through direct evidence or by establishing a prima facie case under the *McDonnell Douglas* framework, the defendants' motion for summary judgment is granted as it relates to all of Dr. Pierotti's race discrimination claims against the university and against Dr. Taylor.

## VII. Dr. Taylor's Qualified Immunity Defenses

 Dr. Annett and Dr. Pierotti are making § 1981 claims of retaliation against Dr. Taylor in his personal capacity. Dr. Pierotti's § 1981 claim of discrimination against Dr. Taylor in his personal capacity has not survived the defendants' motion to dismiss. To prevail on a § 1981 claim of retaliation against an individual, the plaintiff must show the state of mind of the defendant as one element in his substantive claim. *See Reynolds v. School Dist. No. 1, Denver, Colo.,* 69 F.3d 1523, 1532 (10th Cir.1995); *Williams v. Columbia/HCA Healthcare Corp.,* No. 98–2084–JTM, 1999 WL 592674, at \*5 (D.Kan. July 30, 1999).

 Dr. Taylor argues qualified immunity for his personal actions in this case. A public official performing discretionary functions is given qualified immunity from personal liability if his actions did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 812, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The Supreme Court has established a two step analysis in considering a public official's qualified immunity defense. The court must determine first whether the plaintiff has asserted the violation of a constitutional right. Then the court will determine whether the right was clearly established at the time the defendant took the actions at issue. *See Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991); *Gehl Group v. Koby,* 63 F.3d 1528, 1533 (10th Cir.1995). The burden is on the plaintiff to produce evidence to show that the conduct violated the Constitution and that the relevant law

was clearly established at the time of the conduct. *See Gehl Group,* 63 F.3d at 1533.

 Where state of mind is an element of the substantive claim against a public official, this circuit has adopted a modified approach to a qualified immunity defense in a motion for summary judgment. *See id.* at 1535–36 and n. 9. To assert the defense, the defendant "must make a prima facie showing of 'objective reasonableness' of the challenged conduct." *Id.* (quoting *Bruning v. Pixler,* 949 F.2d 352, 356–57 (10th Cir.1991)). The burden then shifts to the plaintiffs to show the defendant's culpable subjective state of mind. *See id.*

> Once the defendant has shown his or her objective reasonableness, the plaintiff's burden to establish subjective motivating animus becomes heightened, requiring specific and concrete evidence rather than mere speculation.

*Id.* (citing *Bruning,* 949 F.2d at 357; *Pueblo Neighborhood Health Ctrs., Inc. v. Losavio,* 847 F.2d 642, 649 (10th Cir.1988)).

 Defendants admit that the plaintiffs have asserted violation of a constitutional right. What they argue is that Dr. Taylor has shown objective reasonableness in his conduct. Dr. Taylor has provided legitimate nondiscriminatory reasons for each of his actions in this case.

Dr. Taylor asserts that Dr. Annett was not qualified. Two external referees did not recommend Dr. Annett for promotion and tenure and one other external referee commented that Dr. Annett would proceed with difficulty at his institution. The court finds it is objectively reasonable to not recommend granting promotion to Dr. Annett under these circumstances.

The promotion packet requires a candidate to attach documentation to support entries made. Manuscripts were not attached to support entries on pages 12 and 13. Members of the department committee had asked Dr. Annett to submit manuscripts to support her entries. The manuscripts were not present when the

committee considered the packet of Dr. Annett. Dr. Annett had stated to Dr. Taylor that three of the manuscripts had not been completed. The court finds it is objectively reasonable for Dr. Taylor to request the Dean to investigate whether Dr. Annett had violated the Faculty Code of Conduct under these circumstances.

Dr. Annett does not present any evidence of a subjective state of mind **of Dr. Taylor.** She relies upon inferences of retaliation in establishing pretext in the third stage of the *McDonnell Douglas* analysis. That evidence is sufficient to support an inference of retaliation. However, evidence that Dr. Carlson believed Dr. Annett's file was 'not friendly,' that Dr. Carlson considered that Dr. Taylor may have been motivated by sex-based bias, that the Provost had undisclosed information which would cause him to recommend against promotion, and that Dr. Holt was asked to recuse himself from the College Committee's deliberations is not specific and concrete evidence which shows that **Dr. Taylor's** subjective intent was retaliation against Dr. Annett. Because Dr. Annett has failed to carry her burden to produce evidence showing retaliatory intent on the part of Dr. Taylor, the court grants the defendants' summary judgment motion and dismisses Dr. Annett's § 1981 claims against Dr. Taylor. Dr. Annett's claim for injunctive relief against Dr. Taylor personally must be dismissed as moot.

As explained above, the evidence produced by Dr. Pierotti includes two letters written by Dr. Taylor which constitute direct evidence of retaliatory intent on the part of Dr. Taylor. Therefore, the court does not need to analyze whether Dr. Taylor has proffered an objectively reasonable basis for his actions toward Dr. Pierotti. If the court assumes that Dr. Taylor's actions were objectively reasonable, it has already found that Dr. Pierotti has presented specific concrete evidence of subjective motivating retaliatory animus on the part of Dr. Taylor. Therefore, it is inappropriate to grant the Defendants' motion for summary judgment as it relates to Dr.

Pierotti's § 1981 claims of retaliation against Dr. Taylor.

**IT IS THEREFORE ORDERED** that Dr. Pierotti's motion to supplement his memorandum in opposition, (Doc. 52), is granted.

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment against plaintiff Annett, (Doc. 39), is granted in part and denied in part. The motion is granted as it relates to all § 1981 claims and Dr. Annett's request for injunction relief against Dr. Taylor personally, and those claims are hereby dismissed. The motion is denied as it relates to Dr. Annett's claims of discrimination and retaliation under Title VII against the university.

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment against plaintiff Pierotti, (Doc. 40), is granted in part and denied in part. The motion is granted as it relates to all race discrimination or disparate treatment claims by Dr. Pierotti against the university (Title VII) or Dr. Taylor personally (§ 1981), and those claims are hereby dismissed. The motion is denied as it relates to retaliation claims by Dr. Pierotti against the university (Title VII) or Dr. Taylor personally (§ 1981) in the decision not to counter the Minnesota offer and in the decision not to approve Dr. Pierotti's transfer to the Indigenous Nations Studies Program. The motion is granted as it relates to all other claims of retaliation made by Dr. Pierotti, and those claims are hereby dismissed.